**Gerhardt S. KESO, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. 6124.**

United States District Court
W. D. New York.

Oct. 8, 1957.

Karl Goldman, Buffalo, N. Y. (Peter L. Costa, Buffalo, N. Y., of counsel), for plaintiff.

John O. Henderson, U. S. Atty., Buffalo, N. Y. (John C. Broughton, Asst. U. S. Atty., Buffalo, N. Y., of counsel), for defendant.

MORGAN, District Judge.

The above is an action brought against the defendant under statutory permission contained in Section 1346(b) of Title 28 U.S.C.

After a careful consideration of the pleadings, the testimony of all the witnesses and the argument, the court is prepared to dispose of the motions: (a) by the defendant at the close of the plaintiff's case to dismiss the complaint for failure to prove by a fair preponderance of the evidence, the cause of action alleged, or any cause of action (b) the motion of the plaintiff for a direction of a verdict which would encompass the damages sustained by the plaintiff and compensate him for pain and suffering allegedly caused by the negligence of defendant's agent. This action arose out of the following circumstances:

On July 24, 1953 at approximately 6:30 in the afternoon of that day, plaintiff, Gerhardt S. Keso, 54 years of age, 5'5" tall, weighing 152 lbs., a real estate broker, was operating a 1949 Nash Statesman which he had purchased new in January 1949 and which, by his own statement and bill of particulars, was valued at $900 after the accident. It was a light, bright day, the atmosphere was clear and the traffic was light. Both plaintiff and defendant testified that there was no approaching traffic in a northerly direction on Main Street as each of them was progressing in a southerly direction on the same street between North Division and South Division Streets, all of said streets being public highways in the City of Buffalo.

At the intersection, there is a traffic control light which was red as the plaintiff, who was ahead of the defendant, arrived at the intersection of South Division Street. The defendant was Richard W. Mauler, who had been in the Postal Service since July 27, 1947

and, at the time of the accident, was employed as a mail carrier, driving what was commonly known as a three quarter ton pickup truck. He testified that he had picked up some mail at a receptacle placed for that purpose at the southwest corner of Main and Eagle Streets about two minutes prior to the accident. He was operating the truck in the course of his employment and with the consent of his superiors. Hence there is no question as to jurisdiction. The defendant also noted that the light in the center of the intersection of Main and South Division Streets was red and he stopped slightly back of the plaintiff.

Each of them testified to an intention to make a left turn into South Division Street, which was permissible under the city ordinances at that intersection.

The plaintiff said that after he came to a full stop, he put his left arm out the window signalling the mail truck behind, and as an indication that he was about to turn left. His rear view mirror and rear window were clear and it was his testimony that the truck of the Postal Service struck plaintiff's Nash car in the rear at a half turn, while each was proceeding to complete said turn. He then testified that he, the plaintiff, stepped on the brakes and clutched the wheel and came to a stop on South Division Street east of Main, along side a large office building, known as Ellicott Square.

As to this point, the mail truckdriver testified positively, and without rebuttal, that, after the parties started to turn east into South Division Street, the plaintiff came to a sudden, unsignalled and unexpected stop. That defendant's driver and plaintiff immediately left their vehicles at or about the imaginary middle line at Main Street and South Division Street and exchanged information, at which time, the driver saw no damage to plaintiff's automobile other than a slight dent in the fender "not larger than the size of a nickel". The driver further testified that after the exchange of names, addresses and license numbers, each car proceeded a short distance into,

and parked on the north side of South Division Street. Thereafter, defendant's driver again talked with plaintiff and asked if anyone was hurt and was given a positive "no" to such query.

It was stipulated that if a garageman were sworn, he would testify to repairs of $81.20 to plaintiff's car. It was particularly reserved in said stipulation that there was no admission of liability on the part of the defendant. The plaintiff claimed that by the sudden application of brakes and tight holding of the steering wheel, followed almost immediately by the sudden pushing of his car, he developed a pain in the right side of the body and in the lower back right side. He testified that he was home for ten days and suffered pain during that period; that he called Dr. Grant T. Fisher, his family physician, within a few days following the alleged accident. Plaintiff testified he is still having backaches and, while he does and can follow his regular occupation and has from a period of three weeks after the accident to date, he can't skate or swim and, whereas he used to walk over a mile and do gardening, he can do neither any more. He testified that the backache does not prevent him from sleeping, but he cannot sit for a long time without getting up and that the pains are more frequent during certain weather changes. He also testified that he cannot climb steps without danger to himself.

On cross examination, he admitted that he was confined to his home only from July 24th to July 27th, 1953 and that his first treatment by Dr. Fisher was on July 31st, 1953 at Dr. Fisher's office. He and Dr. Fisher both testified to light ray treatments and therapeutic electric treatments. Dr. Fisher testified to his qualifications and the court has no doubt as to them. Succinctly, Dr. Fisher testified that plaintiff had a pain in the right sacroiliac, an inflamed condition of the back which he described as traumatic myositis, that the patient complained on flexing the back and when he walked. He put plaintiff on the table

in a well recognized medical test and lifted the leg, at which time he found a muscle spasm. X-ray revealed no fractures. Dr. Fisher testified that he visited the patient at least twice a week, or that the patient visited him at his office at least twice a week and that his bill for services rendered was for the fair and reasonable value of $200 and that the said sum was paid in 1954. He stated that he had no recommendation, that he was testifying from memory and that he was a general and not an orthopedic surgeon. In a statement above Dr. Fisher's signature under date of August 27, 1953, addressed to the attorney for the plaintiff, Dr. Fisher said regarding the plaintiff, "Mr. Gerhardt Keso was treated by me July 31, 1953 for injuries he sustained on July 24, 1953." After reciting the detail above set forth, he concluded, "It is impossible to determine any permanent injury at this time."

The plaintiff testified that after he had signalled the left turn by extending his left arm before the light turned green, he travelled half of the intersection of the east line of Main Street, which he expressed in his opinion was the distance of between 16 to 18 feet. His automobile was equipped with manual gear and he does not recall what gear he was in at the time of the impact. He stated his speed might have been 15 miles a hour, maybe only 10. He really could not say. He further stated that his car travelled one car length, which he estimated to be 16 to 18 feet after the impact, and that when it stopped, he had reached the right, or south side of South Division Street. He failed to recall whether he had any conversation with the mail truckdriver and, when questioned about the garage bill which indicated damage entirely to the right side of his car, said he was drawing on his recollection and believed it to be the left bumper guard, concluding that it was so long ago, he doesn't have the car any more, that he was not sure. Important to this decision, the plaintiff testified that he was separated from his wife, and that day had his wife and child in the 1949 Nash with him.[1] He did not recall what day the accident happened, whether he took his wife and child to their home, when Dr. Fisher first examined him or when Dr. Pio Blanco, an orthopedic specialist, to whom Dr. Fisher referred him, gave him an examination and/or treatment. He testified that he was referred to Dr. Blanco by his attorney, that he took some prescription for a long time and went to Florida that winter, the medicine being lotions and pills for back. He testified to some difficulty with his then employer, Intercity Business Service, located at the Root Building, Buffalo, New York, but that he has been a real estate broker and steadily employed since the accident. He made a specific point of the fact that he had to have four or five pairs of shoes per year, as well as the six pairs owned at the time of the accident, specially fitted at the heel as his right leg was one inch shorter than the left. Both he and Dr. Blanco testified that that condition was not traumatic, but rather congenital. While there was no atrophy of his leg or buttock, he stood with a curve of the lumbar spine to the left. The crest of the right ilium was higher than the left. The lordosis of the lumbar spine was increased. Dr. Pio Blanco testified that the crest of the right pelvic bone was higher than the left and that there was a postural deformity increasing the curve of the sacrum, although there was no spasm of muscles, no splinting or listing of spine when he bent over. Dr. Blanco further testified that patient plaintiff had the congenital shortening of the left leg, which is responsible for the lateral curvature of the spine, and the tilting of the pelvis which had nothing to do with the accident complained of. Dr. Blanco advised a spinogram because of the narrowing of the lumbosacrol interspace, which he testified usually accompanies a

1. Driving under mental tension; and failure to call either wife or daughter as witness.

degeneration of the intervertebral disc. He further testified that he had no other or different treatment to be given; that the patient plaintiff failed to have a spinogram which procedure, in the doctor's opinion, would pinpoint the pain origin. He further testified that disc degeneration does not give pain unless it protrudes and that it is sometimes caused by arthritis in older individuals. He testified that there were normal findings on the neurological examination and on the lower back examination, but there remained a sciatic nerve root compression caused my a degenerated disc and the evidence of the latter was complaint of pain by the patient in the sciatic nerve and complaint by the patient when a LaSague test was found to be positive. In short, the only evidence was subjective. Medical authorities who examined the patient, Dr. Russell V. Erickson, whose qualifications were well stated, treating him as an outpatient at the Veterans Administration stated in substance that there was no objective or radiological evidence of organic pathology, that there was no evidence of disability and that sciatica might be congenital, as well as traumatic. Dr. George A. Cohen, another orthopedic specialist who examined the plaintiff and has complete qualifications therefor, testified in substance that there was no objective evidence of a nerve root depression and that if a nerve root compression existed over a period of time, one would expect in almost all cases that objective signs would appear. He found none and stated as his positive opinion that if plaintiff had nerve root depression, a doctor would have found objective signs.

The foregoing is detail but, in the opinion of this court, needs to be stated in case of review. This court, having seen and heard the witnesses, believes plaintiff failed to prove a cause of action. Upon the above decision, proper findings of fact and conclusions of law may be prepared and presented by the defendant, as well as a judgment of no cause of action.

A patient listening to the witnesses and a review of the pleadings and motions lead me to the inevitable conclusion that even if the defendant was guilty of any negligence, the plaintiff was guilty of such contributory negligence as to defeat his right of action.