ALOYSIUS J. PROSKEY, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4468–67. Filed March 6, 1969.

---

Aloysius J. Proskey, pro se.

*Charles S. Stroad*, for the respondent.

FEATHERSTON, *Judge:* Respondent determined a deficiency in petitioner's income tax for 1965 in the amount of $748.43. The issues presented for decision are: (1) Whether a stipend in the amount of $5,170.02, received by petitioner during 1965 while a resident physician at University Hospital, University of Michigan, constitutes a fellowship grant, $3,600 of which is excludable under section 117(a)(1)(B),[1] or compensation for services rendered to the hospital, taxable under section 61; and (2) if the stipend is a fellowship grant, whether an exclusion is disallowed by section 117(b)(2)(B).

FINDINGS OF FACT

Petitioner was a legal resident of Ann Arbor, Mich., at the time he filed his petition. He filed an income tax return for 1965 with the district director of internal revenue, Detroit, Mich.

During 1965 petitioner was a licensed physician, and was a resident at University Hospital, Ann Arbor, Mich. University Hospital, owned and operated by the University of Michigan[2] in conjunction with its medical school, is a "referral hospital," admitting patients referred to it from practicing physicians throughout Michigan and the surrounding area. Approximately 22,000 patients are hospitalized there annually for 290,000 patient-days; an additional 250,000 patient visits are handled annually in the outpatient clinics. During 1965 there were approximately 335 permanent staff physicians at University Hospital, all of whom were members of the faculty of the University of Michigan Medical School. In addition, 414 residents and interns were appointed to the hospital staff during that year.

Adjacent to the hospital and outpatient buildings are the Kresge Research Building, the Kresge Hearing Research Institute, and the Mental Health Research Institute. Petitioner was not connected with any of these research facilities during the term of his residency at University Hospital.

---

[1] All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise noted.

[2] The parties agree that the University of Michigan is an organization which satisfies the condition for exclusion set forth in sec. 117(b)(2)(A).

University Hospital provides an "Educational Program" for its interns, consisting of "regularly scheduled formal bedside teaching rounds, clinical pathological conferences, formal staff meetings, journal club and X-ray conferences." Residents, however, are not formally provided with such a program, although they occasionally attend conferences. Both residents and interns are entitled to "Academic Privileges," which means that they "are enrolled in the Department of Postgraduate Medicine of the University of Michigan Medical School and are entitled to all the privileges pertaining thereto: e.g., use of library and other educational facilities, sporting events, etc." During 1965 interns were not permitted by the State of Michigan to be licensed to practice medicine, but resident physicians were required to be licensed before they began their residency programs.

Petitioner received his medical education at St. Louis University (hereinafter SLU), from which he was graduated in 1954. After graduation, petitioner interned at Henry Ford Hospital in Detroit, Mich., from July 1954 to July 1955. He then spent 3 years in the U.S. Navy as a medical officer, and upon his discharge therefrom, entered private medical practice in Detroit for approximately 2 years.

Beginning in August 1961 petitioner commenced and subsequently completed the following residency programs:

| Year of residency | Appointment date | Completion date | Department | Location |
|---|---|---|---|---|
| Resident I | 8- 1-61 | 7-31-62 | Internal medicine | SLU Hospital. |
| Resident II | 8- 1-62 | 7-31-63 | Internal medicine | University Hospital. |
| Resident III | 8- 1-63 | 6-30-64 | Internal medicine | University Hospital. |
| Resident III | 7-20-64 | 6-30-65 | Surgery | University Hospital. |
| Resident IV | 7- 1-65 | 6-30-66 | Internal medicine | University Hospital. |
| Resident V | 10- 1-66 | 6-30-67 | Internal medicine | University Hospital. |

During his residency at University Hospital, petitioner also held various positions on the faculty of the University of Michigan Medical School. He was a "Teaching Associate in Internal Medicine" from August 1, 1963, to June 30, 1964; a "Teaching Associate in Surgery" from July 20, 1964, to June 30, 1965; and an "Instructor in Internal Medicine" from July 1, 1965, to June 30, 1966. Upon his appointment to the last position, petitioner became eligible for participation in the retirement plan provided by the University of Michigan for its teaching staff.

The amounts of the stipends paid to petitioner during his residency at University Hospital were not dependent upon his financial needs. Rather, they were determined according to a scale keyed to the number of years of service as a resident. Thus, petitioner received monthly "paychecks" in the amount of $320 when he was a resident III, and approximately $540 when he was a resident IV. These amounts were designated by University Hospital as "compensation" or "salary."

As part of the duties of his residency during 1965, petitioner was directly responsible for making diagnoses and prescribing treatment for patients. However, ultimate responsibility in such matters resided in the senior staff member of the department in which petitioner was serving. In turn, petitioner supervised the activities of medical students, interns, and assistant residents.

In an "Intern and Resident Handbook" issued by University Hospital, the duties of residents and interns were prescribed as follows:

1. Recording of history and physicals on each patient seen promptly after admission of the patient.

2. Writing a progress note at least weekly on each patient's record.

3. Writing a transfer note when a patient is to be transferred to another service.

4. Posting of elective surgery.

5. Obtaining written consent for surgery.

6. Placing upon the danger list ("D.L.") the name of any patient whose prognosis is grave.

7. Completing the death notice and sending it promptly to the Information Desk.

8. Obtaining permission for autopsy and sending permission or rejection of same to the Information Desk.

9. Notifying Medical Examiner in the event of a body dead-on-arrival or other (coroner's) medical examiner's case.

10. Completing the proper procedure in the event of an accident to a patient occurring within the Hospital.

11. Reporting all diseases listed as such by the Michigan Department of Health.

12. Writing a discharge order, if possible, 24 hours prior to that discharge.

13. Dictating a case summary (or discharge letter) promptly after discharge of the patient.

14. Properly utilizing the services of consultants.

While serving as a resident physician at University Hospital, petitioner received benefits in the form of meal discounts, eligibility for group life insurance, Michigan Blue Cross and Blue Shield health benefits, eligibility for loan assistance, uniforms, laundry of uniforms, and a 1-month vacation. Federal income taxes were withheld from petitioner's stipend during 1965.

During the years of his service as a resident at University Hospital, petitioner was not a candidate for a degree.

Petitioner received a stipend of $5,170.02 during 1965 from "The Regents of the University of Michigan." Petitioner reported this amount as "Wages" on his income tax return for 1965, but excluded $3,600 from his gross income on such return. In the notice of deficiency, respondent determined "that stipends received from University Hospital in the amount of $5,170.02 * * * are fully taxable as compensation under section 61 of the Internal Revenue Code," and accordingly disallowed the exclusion of any part of this amount from petitioner's gross income.

ULTIMATE FINDINGS OF FACT

Petitioner received a stipend during 1965 from University Hospital as compensation for employment services. He had received stipends similar in character for more than 36 months prior to the beginning of that year.

OPINION

Petitioner served as a resident physician at SLU Hospital from August 1, 1961, to July 31, 1962,[3] and at University Hospital, University of Michigan, from August 1, 1962, through June 30, 1967. Petitioner here contends that he is entitled to exclude from his gross income $3,600 of the stipend which he received from University Hospital in 1965, on the ground that the stipend constituted a fellowship grant. Respondent has determined that the stipend is fully taxable as compensation under section 61.

We sustain respondent's determination for two reasons: (1) The stipend received by petitioner from University Hospital was not a "fellowship grant" within the meaning of section 117(a)(1)(B);[4] and (2) even if the stipend were a fellowship grant, petitioner had received similar payments for a period in excess of 36 months prior to January 1, 1965, and thus, by virtue of section 117(b)(2)(B), is not entitled to any exclusion for 1965.

As to the first reason, the term "fellowship grant" is defined by section 1.117-3(c), Income Tax Regs., as "an amount paid or allowed to, or for the benefit of, an individual to aid him in the pursuit of study or research." Whether a particular amount satisfies this general definition depends upon the nature of the activities carried on by the recipient. Regulations section 1.117-4(c)[5] provides that a payment will

---

[3] Although the records of University Hospital indicate that petitioner was a resident at "Veteran's Adm. Hospital, St. Louis, Mo." during this period, petitioner repeatedly testified, very credibly we think, that he spent this time as a resident at SLU Hospital.

[4] SEC. 117. SCHOLARSHIPS AND FELLOWSHIP GRANTS.

  (a) GENERAL RULE.—In the case of an individual, gross income does not include—

    (1) any amount received—

    \*      \*      \*      \*      \*      \*      \*

    (B) as a fellowship grant, including the value of contributed services and accommodations; \* \* \*

[5] Sec. 1.117-4 Items not considered as scholarships or fellowship grants.

The following payments or allowances shall not be considered to be amounts received as a scholarship or a fellowship grant for the purpose of section 117:

  \*      \*      \*      \*      \*      \*      \*

  (c) *Amounts paid as compensation for services or primarily for the benefit of the grantor.* (1) \* \* \* any amount paid or allowed to, or on behalf of, an individual to enable him to pursue studies or research, if such amount represents either compensation for past, present, or future employment services or represents payment for services which are subject to the direction or supervision of the grantor.

  (2) Any amount paid or allowed to, or on behalf of, an individual to enable him to pursue studies or research primarily for the benefit of the grantor.

However, amounts paid or allowed to, or on behalf of, an individual to enable him to pursue studies or research are considered to be amounts received as a scholarship or

be considered to be a fellowship grant for the purpose of section 117, if "the primary purpose of the studies or research is to further the education and training of the recipient in his individual capacity * * *"; if, however, a payment represents compensation for employment services or for services which are subject to the supervision of the grantor, it is not excludable as a fellowship grant. Thus, the issue is whether the 1965 stipend from University Hospital was paid to petitioner as a fellowship grant to aid him in the pursuit of study or research, or as compensation for the work he performed.

The trial record, in our view, compels the conclusion that the sums paid to petitioner during 1965 constituted compensation for his services. The material facts upon which this conclusion is based are not in dispute. University Hospital was not operated primarily as an institution for teaching and research, cf. *Wrobleski* v. *Bingler*, 161 F. Supp. 900 (W.D. Pa. 1958), but, on the contrary, was primarily engaged in the care and treatment of patients. With a total bed capacity of 1,037, it handled 22,000 inpatients (hospitalized for 290,000 patient-days) and 250,000 outpatients annually. Although it employed approximately 335 permanent staff members in 1965, University Hospital quite obviously depended on its 414 residents and interns to perform much of the work necessitated by such a large caseload. The number of residents was determined not by the number of qualified students in need of financial assistance, but rather by the need for additional staff members and the availability of funds to pay them.

A more important indication that petitioner's activities at University Hospital during 1965 were geared not to study and research but to the operational needs of University Hospital is the broad scope of the services he was required to perform. In addition to the general responsibilities for making diagnoses and prescribing treatment for the patients to whom he was assigned, and supervising the interns and associate residents working with him, petitioner had other duties. A handbook issued to residents and interns shows that their duties included recording the history and physical examinations of each patient seen, promptly after the patient's admission; writing a progress note at least weekly on each patient's record; posting of elective surgery; obtaining written consent for surgery; completing the death notice for all patients who died; obtaining permission for autopsy; notifying the local medical examiner in the case of a body dead on

fellowship grant for the purpose of section 117 if the primary purpose of the studies or research is to further the education and training of the recipient in his individual capacity and the amount provided by the grantor for such purpose does not represent compensation or payment for the services described in subparagraph (1) of this paragraph. Neither the fact that the recipient is required to furnish reports of his progress to the grantor, nor the fact that the results of his studies or research may be of some incidental benefit to the grantor shall, of itself, be considered to destroy the essential character of such amount as a scholarship or fellowship grant.

arrival; reporting all diseases listed by the Michigan Department of Health; and dictating a case summary (or discharge letter) promptly after discharge of each patient. Although petitioner served as a teaching associate in the medical school, he did not establish that he was exempt from these duties assigned to residents and interns generally. In view of these multitudinous activities, subject as they were to the constant direction and control of University Hospital, petitioner was not free to pursue studies or research of his choice. See *Howard Littman*, 42 T.C. 503, 509–510 (1964); cf. *George Winchester Stone, Jr.*, 23 T.C. 254 (1954).

Further evidence that petitioner's residency during 1965 entailed the performance of employment services may be found in his financial arrangements with University Hospital, and the benefits incident thereto. The amount of the stipend was not dependent on financial need, as is usually true of fellowship grants, see *Edward A. Jamieson*, 51 T.C. 635 (1969); cf. *Aileene Evans*, 34 T.C. 720 (1960), but on the length of service with University Hospital. Thus, petitioner received $320 per month as a resident III and $540 per month as a resident IV. Indeed, a brochure published by University Hospital discloses a steady progression in the amount of the stipend for each succeeding year of residency.

In addition to the cash stipend, all residents were given such perquisites as hospitalization insurance, medical care, and a 1-month vacation. Petitioner also was eligible for participation in a retirement plan and a group life-insurance program. These benefits, particularly the retirement plan and vacation privileges, are usually associated with an employment relationship. See *Woddail* v. *Commissioner*, 321 F. 2d 721 (C.A. 10, 1963), affirming a Memorandum Opinion of this Court.[6] Moreover, University Hospital treated petitioner's stipend as compensation in that it withheld a portion as income taxes,[7] designated the payments as wages and salaries, and, in the "Intern and Resident Handbook," referred to the monthly stipend payments as "Paychecks." None of these characteristics are normally associated with the term "fellowship grant." *Elmer L. Reese, Jr.*, 45 T.C. 407, 413 (1966), affirmed per curiam 373 F. 2d 742 (C.A. 4, 1967).

Petitioner maintains, however, that his principal objective in accepting an appointment as a resident physician at great financial sacrifice

---

[6] We note that the "Intern and Resident Handbook" states that "The University will pay up to the first $10.00 per month toward your health insurance premium *unless you are on a scholarship-fellowship grant*. Other arrangements will be made for these doctors." (Emphasis added.) This indicates that some of the interns and residents were recipients of scholarship-fellowship grants, but petitioner offered no evidence of such a special arrangement in his case.

[7] Admittedly, the fact of withholding alone is not determinative under sec. 117. Cf. *Chandler P. Bhalla*, 35 T.C. 13, 17–18 (1960).

was to obtain training in his profession—to have the opportunity to consult with staff physicians on a variety of medical problems. There can be no serious doubt that work as a resident physician provides highly valuable training, particularly in preparing for specialties in the various fields of medicine. Yet virtually all work as an apprentice, whether in medicine or law, carpentry or masonry, provides valuable training. Nothing in section 117 requires that an amount paid as compensation for services rendered be treated as a nontaxable fellowship grant, merely because the recipient is learning a trade, business, or profession. Whatever training petitioner received during the years of his residency—and we do not deny that it was substantial—was merely "incidental to and for the purpose of facilitating the *raison d'etre* of the Hospital, namely, the care of its patients." *Ethel M. Bonn*, 34 T.C. 64, 73 (1960) ; *Woddail* v. *Commissioner, supra*. We conclude that petitioner was an employee of University Hospital and was paid the stipend as compensation for the services which he rendered. See *Stewart* v. *United States*, 363 F. 2d 355 (C.A. 6, 1966).

We are not unaware that in *Johnson* v. *Bingler*, 396 F. 2d 258 (C.A. 3, 1968), certiorari granted Nov. 18, 1968, the Court of Appeals raised serious questions as to the validity of parts of regulations section 1.117–4(c). That case, however, involved employees on leaves of absence to become full-time students, candidates for doctoral degrees, who received grants measured by their needs for support of themselves and their families, and who were required to maintain prescribed academic standards for continuance of the grants. These facts are vastly different from the facts before us.

The court in *Johnson* concluded that the congressional purpose in enacting section 117 was to eliminate the compensation-versus-gift test previously employed in this area. But neither the statute nor its legislative history indicates that Congress intended to permit exclusion of payments that are actually compensation for the performance of services. See H. Rept. No. 1337, 83d Cong., 2d Sess., pp. 16–17 (1954) ; S. Rept. No. 1622, 83d Cong., 2d Sess., pp. 18, 189 (1954). Indeed, "It is a fair inference that the terms 'scholarship' and 'fellowship' were used as opposed to a term such as 'compensation'." *Ussery* v. *United States*, 296 F. 2d 582, 586 (C.A. 5, 1961). We do not interpret the opinion in *Johnson* to hold that stipends for services of the character here involved are rendered nontaxable merely because they emanate from a qualifying institution (sec. 117(b)(2)(A)) and the performance of those services provides the recipient with valuable training and experience in his chosen profession. Cf. *Frank Thomas Bachmura*, 32 T.C. 1117, 1125 (1959). See *Stewart* v. *United States, supra* at 357; *Woddail* v. *Commissioner, supra; Ussery* v. *United*

*States, supra* at 586; *Stephen L. Zolnay,* 49 T.C. 389 (1968); *Elmer L. Reese, Jr., supra* at 411, 416.[8]

The second reason for sustaining respondent's determination is equally cogent. Even if petitioner were correct in his contention that the payments which he received constituted fellowship grants within the meaning of section 117(a) (1), he would not be entitled to the exclusion for 1965. Section 117(b) (2) (B) provides that—

> no exclusion shall be allowed under subsection (a) after the recipient has been entitled to exclude under this section for a period of 36 months (whether or not consecutive) amounts received as a scholarship or fellowship grant while not a candidate for a degree at an educational institution (as defined in section 151(e) (4)).

As shown by our findings, petitioner received substantially similar stipends from University Hospital and SLU Hospital for more than 36 months prior to the beginning of 1965.[9]

Petitioner argues that the limitation does not apply to him because 1965 was the first year in which he claimed an exclusion for a fellowship grant on his income tax return. But, if there is any ambiguity in the statute, the regulations are crystal clear that the 36-month limitation applies whether or not a taxpayer has made use of the exclusion. Section 1.117-2(b) (2) (ii), Income Tax Regs.,[10] provides that the "limitation applies if the individual has received any amount which was either excluded or *excludable* from his gross income under section

---

[8] This Court has recognized the difficulties involved in the application of that part of the regulation relating to whether a payment is "primarily for the benefit of the grantor." See *Stephen L. Zolnay,* 49 T.C. at 396 fn 5; *Elmer L. Reese, Jr.,* 45 T.C. at 411.

[9] The record provides no adequate explanation of the nature of the payments petitioner received during his year of residency in St. Louis. Assuming, as we do here in dealing with the problem under sec. 117(b) (2) (B), that the amounts petitioner received from University Hospital were fellowship grants, the character of the payments from SLU Hospital becomes crucial in view of the fact that petitioner had been receiving "fellowship grants" from University Hospital for only 29 months (August 1962 through December 1964) prior to the taxable year here involved. If the stipends received from SLU Hospital were substantially different in character from those received from University Hospital— i.e., if they were not fellowship grants while the stipends from University Hospital were— then the 36-month limitation in sec. 117(b) (2) (B) would not apply to the payments received by petitioner during the first 7 months of 1965. However, the burden rested with petitioner to prove such a difference and he utterly failed to do so.

[10] Sec. 1.117-2 Limitations.

(b) *Individuals who are not candidates for degrees*—* * *

* * * * * * *

(2) *Extent of exclusion.* * * *

(ii) No exclusion shall be allowed under section 117(a) (1) to an individual who is not a candidate for a degree after the recipient has, as an individual who is not a candidate for a degree, been entitled to an exclusion under that section for a period of 36 months. This limitation applies if the individual has received any amount which was either excluded or excludable from his gross income under section 117(a) (1) for any prior 36 months, whether or not consecutive. For example, if the individual received a fellowship grant of $7,200 for 3 years (which he elected to receive in 36 monthly installments of $200), his exclusion period would be exhausted even though he did not in any of the 36 months make use of the maximum exclusion. Accordingly, such individual would be entitled to no further exclusion from gross income with respect to any additional grants which he may receive as an individual who is not a candidate for a degree.

117(a)(1) for any prior 36 months, whether or not consecutive." (Emphasis added.) This regulation follows closely the language of the explanatory legislative material accompanying the enactment of section 117, S. Rept. No. 1622, 83d Cong., 2d Sess., pp. 189–190 (1954), and must be sustained. *Commissioner* v. *South Texas Lumber Co.*, 333 U.S. 496, 501 (1948).

*Decision will be entered for the respondent.*