Brian T. and Kathryn Z. Steinhaus v. Commissioner.
Steinhaus v. Commissioner
Docket No. 2665-70 SC.
United States Tax Court
T.C. Memo 1971-279; 1971 Tax Ct. Memo LEXIS 54; 30 T.C.M. (CCH) 1197; T.C.M. (RIA) 71279; November 1, 1971, Filed. Ronald L. Wallenfang, Brady, Tyrreil, Cotter & Cutler, 1000 First Wisconsin National Bank Bldg., 735 N. Water St., Milwaukee, Wis., for the petitioners. Matthew W. Stanley, Jr., for the respondent. CALDWELL
Memorandum Findings of Fact and Opinion CALDWELL, Commissioner: The respondent determined a deficiency in the income taxes of the petitioners for the calendar year 1967 in the amount of $186.41. The sole issue for decision is whether $1500 paid to the husband petitioner as a resident physician's stipend is excludable from income as a fellowship grant under section 117(a)(1) of the Internal Revenue Code of 1954. [1]
*55 Findings of Fact Some of the facts have been stipulated. The stipulation of facts and the supplemental stipulation of facts, together with the exhibits attached to each, are incorporated herein by this reference. Brian T. Steinhaus and Kathryn Z. Steinhaus are husband and wife, who resided in Menomonee Falls, Wisconsin, at the time they filed their petition in this case. They filed a joint Federal income tax return for the calendar year 1967, which is here involved, with the district director of internal revenue at Milwaukee, Wisconsin. Brian Steinhaus will be hereinafter referred to as the petitioner. Petitioner is a physician, having graduated with the degree of Doctor of Medicine from the Marquette University School of Medicine in 1966. While serving an internship in pathology at the Milwaukee County General Hospital during the year following his graduation, petitioner decided that he wanted to become qualified as a psychiatrist. A necessary prerequisite to certification in that specialty by the American Board of Psychiatry and Neurology, was the completion of a three-year residency at an approved hospital. Petitioner was aware that the Milwaukee County Mental Health Center *56 which was an adjunct of the General Hospital was such an approved institution offering a residency program in psychiatry. In the late spring of 1967, he approached the Director of Education at the Mental Health Center and expressed his desire to enter the psychiatry residency program. Petitioner was advised to file a written application, which he did; and he was thereafter interviewed by members of the Educational Review Board of the Center, who were the persons responsible for passing upon the applications for enrollment in the residency program. Petitioner was accepted, and on June 14, 1967, he entered into a "career" psychiatric fellowship agreement with Milwaukee County, which in here pertinent part provides as follows: To the end that the great gap between the qualified psychiatrists and the number who are needed may be alleviated, the following training program agreement is entered into by and between Brian T. Steinhaus, M.D. hereinafter referred to as the Fellow, and the grantor, the County of Milwaukee, 1198 Wisconsin, hereinafter referred to as the County. It is mutually understood and agreed by and between the hereto subscribing parties: 1. The said training program *57 is primarily for the benefit of the Fellow in his education in the field of psychiatry and in his attainment of a certificate from the American Board of Psychiatry and Neurology, Inc., and also for the benefit of the public at large in supplying its dire need for qualified psychiatrists. This agreement is entered into solely for the purpose of effectuating these purposes. 2. The County agrees to afford the Fellow and the Fellow agrees to accept extensive classroom and seminar activity, supervised participation in the treatment of in-patients and out-patients requiring psychiatric or neurological attention, experience in teaching and administration matters for the period of said training program. 3. The Fellow has been selected for this grant by the County solely on the basis of merit and fitness. 4. The Fellow will not be primarily performing services for the County, and any benefits that may be realized by the County will be incidental and not expected; it being understood that the duties performed by the Fellow during said training program are in furtherance of his education and understanding in the complex field of psychiatry and that the Fellow is not replacing any personnel *58 in the employ of the County. 5. The Fellow is not a candidate for a degree. 6. The Fellow agrees that he will continue and remain in the said training program during its entirety as specified below, and will devote his full time, effort and attention to said training program as the County in its sole judgment shall deem necessary for the adequate training of the Fellow. The training program shall total twelve months at first year level, twelve months at second year level, and twelve months at third year level, commencing July 24, 1967 and terminating July 23, 1970. 7. In consideration of the covenants above and to aid the Fellow in the pursuit of his studies, the County agrees to give a fellowship grant to the Fellow, payable bi-weekly, based on the annual amounts of $4,364.00 for first year level, $5,189.00 for second year level, and $6,124.00 for third year level. 8. In further consideration of a Career service stipend, based on $3,000 annually and payable bi-weekly with the fellowship grant above, the Fellow agrees that he, if appointed after the completion of his training program, will serve for a period of not less than two-thirds of the period he received this additional *59 Career service stipend, a minimum service period of twenty-four months, in a psychiatric position, for the County in such assignments as directed * * * In addition to the "career" fellowship agreements, the residency fellowship program also provided for a "non-career" option, under which there was no provision comparable to paragraph 8 of the "career" agreement (set out above), calling for an added two-year post-residency commitment and the accompanying increase in the amount of the stipend. Petitioner's choice of "career" status or "non-career" status was optional and was in no way related to the size of the stipend amounts received pursuant to paragraph 7 of the "career" agreement (set out above). A fellow was not required to state his intention to be a "career" or "non-career" resident prior to his selection by the Educational Review Board at the Milwaukee County Health Center. Petitioner commenced his residency training under the fellowship agreement on July 23, 1967, receiving the annual amounts provided for therein, including the career service stipend of $3,000 annually; and he successfully completed the program during a later year not in issue in this case. The parties *60 have stipulated that Milwaukee County was the grantor of the training stipends paid to petitioner during the taxable year 1967. Milwaukee County is a political subdivision of the state of Wisconsin. The residency program in which petitioner took part was operated by and out of the North Division of the Milwaukee County Mental Health Center. The Center was operated pursuant to Section 46.21(2)(b), Wisconsin Statutes Annotated (1957), which provides as follows: (b) The hospitals and sanitariums of the county shall be devoted to hospital service and the treatment of such persons who would otherwise be unable to secure the same, but other persons may be admitted to the county hospitals upon such terms and conditions as the board establishes. Such hospitals and sanitariums may be utilized for such instruction of medical students, physicians and nurses and for such scientific and clinical research as will promote the welfare of the 1199 patients and assist the application of science to the alleviation of human suffering. The board, subject to the approval of the county board, may make such arrangements with the medical school of the University of Wisconsin *61 or any other duly accredited medical colleges and medical societies for teaching and research in such institutions as in their judgment will best promote the foregoing hospital aims. There is an unwritten administrative emphasis at the Center on the treatment of patients who cannot be treated elsewhere. Other admission criteria included financial ability, patient's choice, and staff limitations. In a brochure dealing with the psychiatric residency program in which petitioner took part, the North Division of the Mental Health Center is described as follows: The North Division of the Mental Health Center consists of several acute phychiatric units totalling 868 beds. One is its 176-bed Diagnostic and Treatment Center through which more than 400 patients per year pass for diagnosis and short-term treatment. Activated in 1958, it is attached to the Milwaukee County General Hospital as a psychiatric wing. The professional staff is organized into teams, new patients being assigned to the teams in rotation for appropriate treatment within the continuum of services offered. Twenty-four hour crisis intervention in psychiatric emergencies is located in this unit and functions in close *62 liaison with the central admission service of the General Hospital which handles both medical and psychiatric referrals. Consultation services are also provided to the General Hospital wards. Another facility of the North Division is the Main Building with its 692 beds. The professional teams utilize these treatment beds for approximately 1500 patients transferred yearly from the Diagnostic and Treatment Center. Although the average daily population of the Main Building has decreased steadily, approximately six times as many patients are treated per year now as compared with ten years ago. The Children's Psychiatric In-patient Service consists of a 20-bed unit which has been in operation since October 1964. It offers diagnostic and treatment services to children in the age group of six to twelve years. The child has a closely structured day consisting of psychotherapy, schooling, occupational therapy, music therapy, and recreational therapy. The Adolescent Service, housed within existing facilities of the North Division and adjacent Children's Home, is presently focused in a new 20-bed center for boys between the ages of 13 and 18. Additional facilities for girls of the same *63 ages are provided. The program specializes in the diagnostic and treatment techniques appropriate to this age group. An additional unit, located within the North Division, is described in the brochure as follows: ADULT PSYCHIATRY CLINIC This unit currently is located in the Diagnostic and Treatment Center of North Division and provides out-patient diagnostic and treatment services to patients 18 years of age and over. Patients released from in-patient service are followed up in the clinic by the team to which the patient was assigned. Patients are also referred directly from the Milwaukee community. The clinic provides psychiatric consultation for outside agencies as well as the out-patient department of the Milwaukee County General Hospital. Expansion has been rapid, from approximately 1,900 visits in its first year, 1959, to almost 13,000 visits in 1966. Basically, residents were expected to be on duty or in training from 8:00 A.M. to 5:00 P.M. each day, with one hour off for lunch, and one-half day on Saturday. Petitioner averaged approximately 16 hours per week attending scheduled classes or conferences. The remainder of the work week was spent in individual supervision *64 by a staff psychiatrist, consultations, patient psychotherapy, research and/or team and ward responsibilities. Hours devoted to classroom instruction decrease during the three-year residency period, with a corresponding increase in the time devoted to the other activities just mentioned. The term "individual supervision" contemplates a session between the resident and a supervising staff psychiatrist, on a one-to-one basis, reviewing primarily the resident's treatment activities of patients assigned to him. Individual supervision was scheduled from one to three hours per week. Some supervision of first year residents, including teaching and administrative responsibility, was undertaken by second and third year residents. The term "consultation" connotes the evaluation of a patient of another physician by medical personnel of a different specialty. Second and third year residents provided consultation services, particularly initial contracts, involving patients referred from the Milwaukee County General Hospital. Several hospital staff psychiatrists and second and 1200 third year residents provided consultation service to outside agencies, with the residents meeting the initial *65 appointment during their assignment to the Adult Psychiatry Clinic. Typically, second or third year resident was assigned to the Adult Psychiatry Clinic a half day per week for six months. First year residents began preparation for the consultations which they would attend in their second and third years. The term "patient psychotherapy" is defined as a therapeutic encounter between a psychiatrist and a patient for purposes of treating the mind, and it may involve an individual patient, a married couple, or a group of patients. During the first year of his training, a resident carried from one to three patients in individual psychotherapy. The number of individual psychotherapeutic patients carried by a resident increased over the three-year period of his residency program. A resident averaged from one to three hours per week per patient with respect to his individual psychotherapy load, while each group in psychotherapy is generally scheduled for an hour and a half per week. The North Division of the Mental Health Center has adopted the team approach to mental health treatment, whereby a team of professionals (including a psychiatrist, a psychologist, a psychiatric nurse, and *66 psychiatric aides) is given responsibility for treating a designated number of patients. A resident also serves as a member of a treatment team, to which he is assigned on his first day in the residency program, and he sometimes takes the place of the staff psychiatrist in the latter's absence. The resident's greatest identification with the team is in his first year in the program. The North Division of the Mental Health Center embraces 16 patient wards. A resident fellow has regularly scheduled ward responsibilities which can be minimally discharged in a matter of an hour and a half per day. Ward rounds offer additional opportunity for the resident to meet with his patients and are undertaken generally without immediate staff supervision. His ward responsibilities decreased as the program progressed and as he assumed a greater responsibility with respect to more sophisticated and more refined treatment requiring greater experience, that is, psychotherapy with out-patients. During the latter period of his training, a resident is encouraged to undertake teaching responsibilities, which would be the function of staff psychiatrists if residents were not available for that purpose. *67 A resident teaches other residents, medical students, and nursing personnel. A resident also had certain responsibilities for the admission of new patients to the Center. He reviewed the notes of the psychiatric social worker, contacted the patient himself, and detailed the nature of the new patient's difficulties. A resident had authority to determine whether the new patient should be admitted; to determine the type of treatment to be given such a patient; and to write up the orders on the new patient (x-ray, physical examination; laboratory tests, and prescription of sedatives). On occasion, a resident would interview the relatives of a new patient. Funds to finance the residency program came from two sources: from Milwaukee County through authorization of the County Board of Supervisors and from the Federal Government through grants awarded by the National Institute of Mental Health. The stipend paid to petitioner during the taxable year here involved was paid entirely from county funds. The residency program at the Mental Health Center sought recruits through the placement of advertisements in professional papers and journals, though correspondence with medical schools, *68 and through word-of-mouth recruitment by graduates of the program. The principal factor in determining the amount of stipend was the rates paid by other residency programs with which the Mental Health Center competed for qualified applicants. Also taken into consideration was the amount required for residents to maintain their families. Petitioner's individual needs and circumstances were not involved in fixing the amount of the stipend paid to him; nor was the amount of his stipend re-evaluated with him personally following his acceptance in the program. The residency position occupied by petitioner was subject to Milwaukee County Civil Service regulation, and was included among the "unclassified" service, and was given code number 875.5. The Milwaukee County Civil Service regulations also fix the amount of compensation, payable biweekly, to be paid persons occupying positions in the Civil Service. The residents (including petitioner) received regular cost-of-living increases which 1201 were given to the classified employees of the County; and Blue Cross-Blue Shield coverage was made available to him. Petitioner had the right to a two-week vacation each year, but he did not *69 use all of the vacation to which he was entitled. Federal income tax was withheld from the stipend paid to him. Petitioner received $1500 in residency stipends under paragraph 7 of the fellowship agreement during 1967. He did not include this amount in income on the joint Federal income tax return which he filed with his wife for that year. He also received "career" stipends under paragraph 8 of that agreement, which were included in income on that return. The respondent, in his statutory notice of deficiency, included the $1500 mentioned above in income for 1967. Opinion The issue here presented is whether the $1500 which petitioner received as a resident physician's stipend from the Milwaukee County Mental Health Center in 1967, is excludible from income as a fellowship grant. Section 117 of the Code of 1954, which deals with the exclusion from income of scholarships and fellowships, provides in here material part as follows: Sec. 117. SCHOLARSHIPS AND FELLOWSHIP GRANTS. (a) General Rule. - In the case of an individual, gross income does not include - (1) any amount received - * * * (B) as a fellowship grant, * * * (b) Limitations. - * * * (2) Individuals who *70 are not candidates for degrees. - In the case of an individual who is not a candidate for a degree at an educational institution (as defined in section 151(e)(4)), subsection (a) shall apply only if the condition in subparagraph (a) is satisfied and then only within the limitations provided in subparagraph (B). (A) Conditions for exclusion. - The grantor of the scholarship or fellowship grant is - * * * (iv) The United States, or an instrumentality or agency thereof, or a State, a territory, or a possession of the United States, or any political subdivision thereof, or the District of Columbia. (B) Extent of exclusion. - The amount of the scholarship or fellowship grant excluded under subsection (a)(1) in any taxable year shall be limited to $300 times the number of months for which the recipient received amounts under the scholarship or fellowship grant during such taxable year, * * * The Income Tax Regulations under the foregoing Code section, provide in here material part, as follows: Sec. 1.117-4 Items not considered as scholarships or fellowship grants. The following payments or allowances shall not be considered to be amounts received as a scholarship or a fellowship *71 grant for the purpose of section 117: * * * (c) Amounts paid as compensation for services or primarily for the benefit of the grantor. (1) Except as provided in paragraph (a) of Sec. 117-2, any amount paid or allowed to, or on behalf of, an individual to enable him to pursue studies or research, if such amount represents either compensation for past, present, or future employment services or represents payment for services which are subject to the direction or supervision of the grantor. (2) Any amount paid or allowed to, or on behalf of, an individual to enable him to pursue studies or research primarily for the benefit of the grantor. However, amounts paid or allowed to, or on behalf of, an individual to enable him to pursue studies or research are considered to be amounts received as a scholarship or fellowship grant for the purpose of Section 117 if the primary purpose of the studies or research is to further the education and training of the recipient in his individual capacity and the amount provided by the grantor for such purposes does not represent compensation or payment for the services described in subparagraph (1) of this paragraph. Neither the fact that the recipient *72 is required to furnish reports of his progress to the grantor, nor the fact that the results of his studies or research may be of some incidental benefit to the grantor shall, of itself, be considered to destroy the essential character of such amount as a scholarship or fellowship grant. In the recent case of Bingler v. Johnson, 394 U.S. 741, the Supreme Court had before it the just-quoted portion of the regulations, and the Court in that case sustained their validity. In the course of its opinion, the Court stated the "ordinary understanding of 'scholarships' 1202 and 'fellowships'" to be "relatively disinterested, 'no-strings' educational grants, with no requirements of any substantial quid pro quo from the recipients." (394 U.S., at 751). In the case at bar, there is no question as to the qualification of the grantor under the statute - it was Milwaukee County, a political subdivision of the state of Wisconsin; nor is there any question as to the amount being within the $300-per-month limitation. The question narrows to one of whether the $300 per month paid to petitioner was a "relatively disinterested, 'no-strings' educational grant with no requirement *73 of any substantial quid pro quo" from the petitioner, or whether it represented compensation for his services as a resident physician. If we looked only to the fellowship agreement, it might be possible for petitioner to prevail in this case. But when regard is had to the Wisconsin statute (set forth in our findings) under which the Milwaukee Health Center operated, and the actual carrying out of the agreement by the residents (including, of course, the petitioner), we are constrained to the view that he was supplying, and in a relatively substantial manner, the "quid" (services) for Milwaukee County's "quo" (stipend). Our findings are rather complete, and it would serve no useful purpose to re-canvass them in this opinion. Suffice it to point out that petitioner's stipend was in no way geared to his individual needs; that petitioner performed significant services to the Health Center in caring for a portion of the large number of patients which passed through it; and that he was treated in several ways as an employee by Milwaukee County. It would not be realistic to say that petitioner's participation in the residency program did not provide him with valuable training for his *74 medical specialty of psychiatry. However, what this Court said in Aloysius J. Proskey, 51 T.C. 918, 925, is apposite in this regard: Yet virtually all work as an apprentice, whether in medicine or law, carpentry or masonry, provides valuable training. Nothing in Section 117 requires that an amount paid as compensation for services rendered be treated as a non-taxable fellowship grant, merely because the recipient is learning a trade, business or profession. Whatever training petitioner received during the years of his residency - and we do not deny that it was substantial - was merely "incidental to and for the purpose of facilitating the raison d'etre of the Hospital, namely, the care of its patients." Petitioners press strongly in their brief the testimony of witnesses in their behalf, that the Center could have functioned just as effectively without the services of petitioner and the other residents. A similar contention was made in the very recent case of Frederick Fisher, 56 T.C. - (No. 92, August 30, 1971). We apply here what we said there in disposing of that contention (56 T.C., at p. - ). The services performed by residents at the Center were extensive. *75 Even if the hospital could "operate" without residents, we think it quite doubtful that the Center could continue to care for as many patients and as effectively as it could with their help. Cf. Ethel M. Bonn, 34 T.C. 64, 71. [7] More fundamentally, even if the Center could do without residents, it did not do without them; it used their services, and it paid for them. Many employees may be dispensable in the sense that their employers could "operate" without them. But such dispensability hardly renders their salaries noncompensatory. We hold that the $1500 received by petitioner in 1967 pursuant to paragraph 7 of his fellowship agreement with Milwaukee County was compensation for his services in that year, and that it is not excludable from gross income. Frederick Fisher, supra; Aloysius J. Proskey, supra. Reviewed and adopted as the report of the Small Tax Case Division. Decision will be entered for the respondent. 1203 Footnotes
1. All statutory references are to the Internal Revenue Code of 1954.↩
7. It is far from clear to us that the Center would continue to be as attractive to staff physicians if it ceased to be a teaching hospital. * * *↩