DOUGLAS R. JACOBSON, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Jacobson v. Commissioner
Docket No. 1626-71.
United States Tax Court
T.C. Memo 1974-177; 1974 Tax Ct. Memo LEXIS 143; 33 T.C.M. (CCH) 762; T.C.M. (RIA) 74177; June 27, 1974, Filed. *143 Petitioner, a resident physician in ophthalmology excluded $3,600 from his income in calendar year 1968 under section 117, I.R.C. Held: that the excluded amount was compensation and, therefore, includable in income. Douglas R. Jacobson, pro se. Peter D. Bakutes, for the respondent. IRWIN
MEMORANDUM FINDINGS OF FACT AND OPINION IRWIN, Judge: Respondent determined a deficiency in petitioner's income tax for the taxable year 1968 in the amount of $751.15. The only issue for decision is whether petitioner was entitled to exclude $3,600 from gross income under section 117, I.R.C.[1]
FINDINGS OF FACT Some *144 of the facts of this case have been stipulated and are so found. The stipulation of facts and the exhibits attached thereto are incorporated by this reference. Douglas R. Jacobson (herinafter referred to as petitioner) is an individual whose residence at the time of the filing of the petition herein was Palo Alto, Calif. A Federal income tax return for the year 1968 was duly filed with the district director of internal revenue at San Francisco, Calif.
Petitioner is a graduate of the University of Chicago School of Medicine. He served his internship at the University of California Medical Center, San Francisco, Calif., from July 1, 1965, to June 30, 1966. Petitioner had received his license to practice medicine in California. Upon completion of medical school, in June 1965 petitioner applied for a residency in ophthalmology at hospitals associated with Stanford University School of Medicine. The Stanford Eye Residency is an integrated program offering training over a 42-month period. The first six months of the residency are spent in studying the basic sciences of ophthalmology. The following twelve months are spent in obtaining clinical experience. During the next twelve-month *145 period the resident is assigned to nearby hospitals. The last twelve months are spent in the position of chief resident. Petitioner began his residency on July 1, 1967. Shortly thereafter, he entered into a contract, dated October 23, 1967, with the Palo Alto-Stanford Hospital Center (sometimes hereafter referred to as the hospital). That contract covered calendar year 1968 and involved the twelve months of clinical experience. Part of it provided as follows: During the period of your appointment, you will be assigned duties at the Palo Alto-Stanford Hospital Center and, at the discretion of the Physician in Chief of your service you may be assigned temporary duties at other institutions affiliated with the Stanford University School of Medicine. While you are serving at Palo Alto-Stanford Hospital Center, your stipend will be $408.33 per month. Uniform (but not personal) linen will be laundered by the institution. Also, while on duty at the Palo Alto-Stanford Hospital Center and if your stipend is coming from the hospital, hospitalization insurance will be paid for you and your dependents, and you and your dependents may receive outpatient medical care at no cost at the *146 Stanford University Clinics. You will be granted two weeks vacation to be scheduled by the Physician in Chief of your department. Some of the campus facilities of Stanford University are available to intern and resident physicians. * * * * * * It is understood that as a condition of your acceptance of this appointment you will follow all rules and regulations concerning the practice of medicine and general conduct in the Palo Alto-Stanford Hospital Center and other institutions affiliated with Stanford University School of Medicine, which rules and regulations will be made known to you upon your arrival. It must be further understood that this appointment and its continuance are subject to and conditioned upon performance of all work and duties assigned to you in a satisfactory manner and acceptable personal conduct throughout the term of the appointment. In the event that at any time the Physician in Chief of your department determines that your performance or conduct is unsatisfactory, the appointment, and all of the rights and obligations thereof, may thereupon, or at any time thereafter, be terminated at the option of Palo Alto-Stanford Hospital Center. In addition to *147 the above-described benefits petitioner was also entitled to paid sick leave benefits upon approval of the chief resident and participation in California State Disability Insurance. The campus facilities available to residents included the use of libraries, the gymnasium, and the golf course, and they also received a reduction on tickets to athletic events. Generally, the amounts of stipends paid residents were determined according to year of residency with increases for each year so that doctors who had been residents for the same amount of time received stipends which were equal in amount. As the residents' training, experience and salaries increased each year, so did their responsibilities. The amount of the stipends was not based on financial need. The hospital withheld income and F.I.C.A. tax on the entire stipend. The Palo Alto-Stanford hospital building is contained within the Stanford Medical Center. The hospital is a nonprofit corporation owned by the city of Palo Alto and Stanford University. Its personnel are under the direction of a board of directors and an administrator. The hospital has no source of income other than from its patients. Consequently, it *148 provides medical services to any patient able to pay for such services, regardless of the patient's teaching value. During the year in question petitioner devoted approximately 60 hours per week to his residency. His time was spent about equally in lectures, study and clinical work. While working at the clinic, he examined patients, took case histories, dictated tentative diagnoses subject to the approval of faculty members, conferred with referring doctors and cared for patients. He also performed minor surgery and had emergency room responsibilities periodically. The patients seen by petitioner in the clinic were those chosen because of educational value, or those referred to the clinic by other doctors or those who voluntarily made appointments. In addition to patients who were seen because they possessed the means to pay for their care, certain indigent patients of educational interest were also treated. The examination of patients was more deliberate at the Stanford clinic in comparison to other ophthalmological clinics where petitioner worked. During some half-day periods only three patients might be seen by the two or three residents and three faculty members. During *149 other half-day sessions the members of the clinic might see ten patients. Approximately 17,000 patient visits were recorded and about 1,100 ophthalmic surgery procedures were performed annually at the eye clinic of the center and its affiliated institutions. During 1968 petitioner received payments totaling $5,494.08 from the hospital. On his income tax return for that year petitioner excluded $3,600 from income under section 117, the maximum amount allowable for an individual who is not a candidate for a degree. Respondent determined that the amounts so excluded were compensation for services rendered and were not excludable from income. OPINION Under section 117(a) amounts received "as a scholarship at an educational institution" or as a "fellowship grant" are excluded from gross income. That section, however, does not define the terms "scholarship" or "fellowship grant." Instead, we must look to the regulations promulgated under section 117. Under section 1.117-4(c) (1), Income Tax Regs., if any "amount represents either compensation for past, present, or future employment services or represents payments for services which are subject to the direction or supervision *150 of the grantor," it does not qualify for exclusion within the meaning of section 117. In Bingler v. Johnson, 394 U.S. 741 (1969), the Supreme Court upheld those regulations. we must, therefore, determine whether the payments to petitioner were primarily for the purpose of furthering his education and training or whether the payments were made primarily to compensate petitioner for services which benefitted the hospital. See Elmer L. Reese, Jr., 45 T.C. 407 (1966), affd. per curiam 373 F.2d 742 (C.A. 4, 1967). In so doing we are aware that prior cases involving payments to resident physicians who assisted in the care of patients have often held the payments to be for services and, therefore, includable in gross income. See Aloysius J. Proskey, 51 T.C. 918 (1969); Irwin S. Anderson, 54 T.C. 1547 (1970); Frederick Fisher, 56 T.C. 1201 (1971). Petitioner maintains that he should be entitled to exclude the claimed amount because he participated in the ophthalmology program for educational purposes and not because of the "stipend" which he would receive. In support of his argument he makes the point that *151 had he chosen to practice general medicine he could have made substantially more money than he did as a participant in the ophthalmology program. In the Proskey and Anderson cases we considered the same contentions and found them unpersuasive. We stated as follows: There can be no serious doubt that work as a resident physician provides highly valuable training, particularly in preparing for specialties in the various fields of medicine. Yet virtually all work as an apprentice, whether in medicine or law, carpentry or masonry, provides valuable training. Nothing in section 117 requires that an amount paid as compensation for services rendered be treated as a nontaxable fellowship grant, merely because the recipient is learning a trade, business, or profession. Whatever training petitioner received during the years of his residency - and we do not deny that it was substantial - was merely "incidental to and for the purpose of facilitating the raison d'etre of the Hospital, namely the care of its patients." Ethel M. Bonn, 34 T.C. 64, 73 (1960); * * * In the instant case we believe that the payments were made primarily for services rendered. The residency agreement *152 between the hospital and petitioner indicates the existence of the quid pro quo discussed in Bingler, supra. The hospital expected petitioner to perform services and petitioner did, in fact, render services which assisted in the care of the hospital's patients. The quality and extent of his services were to increase with each year of his residency. In return the hospital paid him a stipend from which it withheld Federal income taxes. The "stipend" was not determined on the basis of need, but was instead determined by length of service. We, therefore, believe that the payments to petitioner represent compensation which is not excludable from gross income. Accordingly, Decision will be entered for the respondent. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended. ↩