JOHN E. HAMACHER and MARJORIE E. HAMACHER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Hamacher v. Commissioner
Docket No. 4517-71.
United States Tax Court
T.C. Memo 1974-106; 1974 Tax Ct. Memo LEXIS 211; 33 T.C.M. (CCH) 529; T.C.M. (RIA) 74106; April 30, 1974, Filed. James R. Thorpe, for the petitioners. Matthew W. Stanley, Jr., for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION
SCOTT, Judge: Respondent determined a deficiency in petitioners' Federal income tax for the calendar year 1968 in the amount of $722.77. The only issue for decision is whether petitioners may exclude the amount of $3,600 from their gross income for 1968 under section 177, I.R.C. 1954, [1] such amount being a portion of the amount received during that year by John E. Hamacher as a general surgery and plastic surgery residency stipend from University *213 Hospitals, a part of the University of Wisconsin Center for Health Sciences, Madison, Wisconsin. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. John E. and Marjorie E. Hamacher, husband and wife, were residents of Madison, Wisconsin, at the time of the filing of their petition in this case. They filed their joint Federal income tax return for the calendar year 1968 whith the district director of internal revenue, Milwaukee, Wisconsin. In June 1964, John E. Hamacher (hereinafter referred to as petitioner) received his medical degree from the University of Wisconsin. After receiving his degree, petitioner served as a medical intern at Wayne County Hospital, Detroit, Michigan, until June 1965. From July 1965 until July 1968, petitioner served as a resident in general surgery at University Hospitals, Madison, Wisconsin, which is part of the University of Wisconsin Center for Health Sciences. During the last 6 months of his general surgery residence, from Januray until July 1968, petitioner was on a 3-months rotation on the private service of a surgeon at University *214 Hospitals and was on a rotation of 2 or 3 months on the private service of a panel of 5 surgeons at Madison General Hospital. Petitioner's stipend for these 6 months was $3,200, based on $6,400 annually. For the remaining 6 months of the calendar year 1968, petitioner served as a plastic surgeon resident at University Hospitals. Residents at University Hospitals rotate to other hospitals in Madison, including St. Mary's Hospital, Madison General Hospital and Veterans Hospital. Residents serving in the plastic surgery program at University Hospitals customarily rotate also to other hospitals, including Mayo Clinic in Rochester, Minnesota, and Passavant Hospital in Chicago. Similarly, residents from those hospitals may sometimes rotate to University Hospitals. However, petitioner, while a plastic surgery resident during the last half of 1968, did not rotate to any affiliated hospital either within or without Madison. His stipend for the last 6 months of 1968 was $3,575, based on $7,150 annually. Petitioner was at the time of trial associated with Madison Plastic Surgery Associates, a service corporation of three plastic surgeons including petitioner, and was by appointment *215 on the part-time attending staff of University Hospitals and by virtue of such appointment on the part-time faculty of the University of Wisconsin Medical School, in both instances as assistant professor of surgery in the Department of Plastic Surgery. Petitioner was also on the attending staff of three private hospitals, St. Mary's Hospital, Methodist Hospital, and Madison General Hospital, and was a consultant to Veterans Administration Hospital. While petitioner was serving as a resident in general surgery and plastic surgery in 1968, he was not a candidate for a degree at an educational institution within the meaning of section 117. During rotation to Madison General, which is a private hospital, it was customary for one or two medical students, an intern and a resident to operate as a team with the resident in charge of the team. The team in turn was responsible to the patient's attending physician. In return for the services of those residents, these three Madison hospitals contributed financial support to the residency programs at University Hospitals. During the general surgery and plastic surgery residencies of petitioner, Madison General Hospital was billed by University *216 Hospitals for payroll payments, including withholding and social security taxes, covering the periods of activities of the residents of University Hospitals at Madison General Hospital. St. Mary's Hospital appropriated funds in their fiscal operating budget to pay the residents, rotating from University Hospitals, directly rather than being billed by University Hospitals. The University Hospitals are public state institutions dedicated to the care of persons afflicted with malady or deformity of a nature which could probably be remedied by hospital treatment, who otherwise would be unable to secure such treatment. However, University Hospitals do accept private patients. The care provided by attending physicians and residents does not vary perceptively with a patient's ability to pay.
Residents, as well as attending staff physicians and interns, are included on the "house staff" of University Hospitals. During the calendar year 1968 University Hospitals had 743 beds and a staff consisting as follows: Number of full-time staff physicians
270
Number of part-time staff physicians
223
Number of residents
204
Number of interns
37
Number of medical students
406
*217 Generally, the doctors on the full-time staff, who have their offices at University Hospitals, have responsibilities of teaching, of administration, of engaging in research and of treating a few patients per day. Part-time staff doctors, who do not have their offices at University Hospitals, have responsibilities of teaching and of treating patients on certain days of the week. The monies used to pay petitioner's stipends and the salaries of all employees (other than the attending staff physicians whose compensation comes from separate bills submitted to private patients able to pay and their salary, if any, from the University of Wisconsin Medical School) of University Hospitals are provided by the hospitals' annual operating budget, University Payroll Account No. 136, which is funded to the extent of 40 percent by appropriations from the State of Wisconsin through the University of Wisconsin and to the extent of 60 percent by patient billings for room charges. University Hospitals withhold from residents' stipends Federal income and social security taxes. By comparison, gifts and grants in aid provided by University Hospitals are paid from a separate account, University Payroll *218 Account No. 133. Residency programs, including the general surgery and plastic surgery residency programs at University Hospitals, must compete with other hospitals and schools for qualified residents. A principal consideration in the establishment of stipend rates for residents is that they be competitive with those offered by other institutions. The fundamental purpose of University Hospitals in regularly recruiting and maintaining a corps of residents and interns is to provide highly trained physicians for the State of Wisconsin as the Wisconsin Governor's Task Force on Medical Education has indicated that it is a tendency for physicians to locate in the state of internship and residency training rather than in their state of residence or medical school training. However, there is no requirement that an intern or resident locate in Wisconsin when his internship or residency is completed. As a plastic surgery resident, the objective of petitioner was to achieve board certification by the American Board of Plastic Surgery, Inc., St. Louis, Missouri. The "Booklet of Information" published by the American Board of Plastic Surgery for 1969-70 states that a requirement for certification *219 is training in general plastic surgery for a period of not less than 2 years in a residency approved by the Residency Review Committee for Plastic Surgery, after 3 years of training in general surgery beyond the intern year, as a resident in a hospital approved by the Conference Committee on Graduate Training in Surgery. Further requirements as contained in the "Booklet of Information" for certification by the American Board of Plastic Surgery are that during the residency years of training "a candidate must hold positions of increasing responsibility for the care of patients" and grow "to the stature of complete responsibility for the surgical care of the patient." University Hospitals' plastic surgery and general surgery residency programs satisfied the requirements of the Residency Review Committee for Plastic Surgery and the Conference Committee on Graduate Education in Surgery. Such residency programs were approved as well by the American Medical Association. A document entitled "Residencies in Surgery," dated September 8, 1970, submitted to the Conference Committee on Graduate Education in Surgery for the purpose of obtaining continued approval of that body for the certification *220 of the University Hospitals' general surgery residency programs, is descriptive of the programs. It in part describes the function of the residents as managing the preoperative and postoperative care of patients with direction by the attending staff. Surgical procedures are performed by junior residents under the supervision of the attending staff and are performed by senior residents with the attending staff available or in attendance. The American Board of Plastic Surgery informed petitioner that he qualified for certification by a letter dated May 22, 1971. During petitioner's plastic surgery residency for the year July 1968 to July 1969, petitioner performed 549 plastic surgical operations and was the principal surgeon in 294 of these operations. During petitioner's plastic surgery residency for the year July 1969 to July 1970, petitioner performed 544 plastic surgical operations and was the principal surgeon in 382 of these operations. A "Procedural Manual for Interns and Residents," distributed to its interns and residents, including petitioner, by University Hospitals describes the duties of intern-resident staff as follows: Patients are our main concern. On *221 the wards, the intern is usually in direct charge of patient care, but he is responsible to his resident, who, in turn, is the representative of the ward physician. * * * It is essential that the patient and his family feel assured that there is a continuing sense of responsibility on the part of both house staff and attending staff. In Wisconsin, a license to practice medicine or surgery is required by all individuals, including residents, to treat patients beyond the year of required internship. Therefore within 6 months of his entry into the general surgery residency program at University Hospitals, petitioner was required to and did obtain a State of Wisconsin license to practice medicine. Petitioner was eligible for a 1-month vacation per year with stipend after completion of the first year of his residency training, subject to approval of the chairman of his department. While petitioner was on active duty for training with the U.S. Army Reserve during his residency he received his stipend. If petitioner became ill, he, as a member of the house staff, was entitled to be treated by the university student health staff. Petitioner as a member of the house staff was provided *222 with Blue Cross Hospitalization for himself and his family by the Professional Staff Fund of University Hospitals. The private practice of medicine by petitioner, while he participated in the general surgery and plastic surgery programs at University Hospitals, was prohibited, both within and outside University Hospitals, unless authorized in writing by petitioner's departmental chairman. Petitioner did practice as a part-time private physician at night in attendance in emergency rooms of private hospitals during 1968 and received $1,175 for such services. University Hospitals provided residents, including petitioner, with laundry service. Petitioner, as a resident of University Hospitals, was provided with medical protective insurance for the practice of medicine within the scope of the residency programs with which he was associated. Each new member of the house staff of University Hospitals, including petitioner, was required to have a physical examination by the university health out-patient physician staff on his initial appointment. Petitioner as a resident received a 5.5 percent salary increase in September 1969 when such increase was granted to University Hospitals *223 employees. In the general surgery and plastic surgery residencies at University Hospitals there was a gradation in competency of residents, including petitioner, as operating surgeons and in petitioner's case this was signified by petitioner's title as Resident III and IV, a senior resident, and by his annual increments in stipend. Residents' stipends were uniformly based on years of residency, increasing on an annual basis, and were unaffected by marriage status or number of dependents. Generally, the daily routine of residents in the general surgery and plastic surgery residency programs at University Hospitals includes medical operations in the morning and ward rounds in the afternoon. With respect to his general surgery residency, petitioner's duties were primarily to work with that attending physician to whom he was assigned, whether it was at University Hospitals or Madison General, in the care of that attending physician's patients. Petitioner would see the patients going to surgery each morning, usually accompanied by the attending physician, and assist the attending physician or have the attending physician assist petitioner in the surgical operation. Upon completion *224 of the surgical schedule, petitioner would make informal "rounds" of his attending physician's patients to make sure that the "ship was in order" and to further familiarize himself with each patient's condition. Later in the afternoon petitioner would accompany the attending physician in his formal "rounds" and in the out-patient clinic, seeing that attending physician's patients. When the attending physician would leave the hospital, the general surgery resident would stay at the hospital and find another attending physician to assist. During 1968 the plastic surgery residency program was staffed by one full-time staff physician and two part-time staff physicians. Petitioner never rotated to any physician other than the three staff physicians who ran the program. When one of these three physicians would operate at University Hospitals, petitioner as a plastic surgical resident at University Hospitals would operate with that individual in the morning, make "rounds" with such physician in the afternoon and go to that physician's office with him in the afternoon to see his patients there. This is dissimilar to the activities of a general surgery resident who always stays at the *225 hospital whether or not his assigned attending physician departs the hospital. As the general surgery resident and plastic surgery resident are legally licensed to perform surgery, the resident may and does perform surgery without the attending physician being at the hospital, but the responsibility for the care of the patient lies with the attending physician and the attending physician "calls the shots." However, at private hospitals, the attending physician is always present when an operation is performed on one of his patients. Both plastic and general surgery residents at University Hospitals have regularly scheduled night call responsibilities, assisting a similarly assigned attending staff physician who is primarily responsible for night call. As a general rule plastic surgery and general surgery residents at University Hospitals would be required to have a substitute and to inform their attending physicians if the residents were incapacitated or otherwise unavailable when they are assigned to be on night call at the hospital. General surgery residents who are on night call stay at the hospital to answer problems wherever they might arise in the hospital and in an acute *226 emergency the resident will immediately provide care for the patient until the attending physician who is on call can get to the hospital. The general surgery resident who is on night call makes an evaluation of the situation and decides what treatment is required and then discusses his conclusion with the attending physician immediately or at a later time, depending on the nature of the problem involved. Plastic surgery residents who are on night call stay at home and when called by the intern or general surgery resident go to the hospital if they consider it necessary or answer whatever questions the intern on duty would ask of them over the telphone if it is not necessary for them to go to the hospital. If necessary, the resident contacts the attending physician. The University Hospitals were adequately staffed with general surgery and plastic surgery physicians so that if there had been no residents in these areas at the hospital the number of general surgery or plastic surgery staff physicians would not necessarily have been increased. However, without the general surgery and plastic surgery residents the care of patients would have been diminshed as residents make independent *227 examinations of the patients, formulate judgments, read and fill in patients' charts, perform or assist in operations, make rounds and work in clinics, even though the attending staff has the primary responsibility for patient care and is in attendance daily at the hospitals. During 1968 petitioner as a general surgery resident would attend the clinics for an hour or two, two or three afternoons a week, and as a plastic surgeon resident three afternoons a week, to see outpatients. Outpatients were those who had been operated on previously or were being referred to the clinic for the first time. In the clinics petitioner as a general surgery resident would perform complete physical examinations on patients and as a plastic surgery resident would perform more limited physical examinations. usually, but not always, the attending physician would be present in the outpatient clinic. The decision whether to operate would usually be made at the time the patient was seen in the outpatient clinic by the attending physician after consulting with the resident. While in the clinic petitioner would direct the activities of whatever interns and nurses were in the clinic. The emergency room *228 of University Hospitals was the responsibility of the attending general surgical staff on 1968. When a patient arrived in the emergency room during normal daytime hours an intern would decide what the problem was and call the appropriate department, such as general surgery or plastic surgery, to have a resident see the patient. The resident would go down to physically exmaine the patient and to make some decision with respect to the treatment of that patient. The resident in turn would report the problem and what he proposed to do about it to the attending physician and then the decision would be made as to what care the patient needed. If the problem were minor, the resident might treat the problem and later tell the attending physician what had been done; or the resident might consult the attending physician by telephone before rendering any treatment and, after consultation, carry out the treatment directed by the attending physician. When petitioner was called to the emergency room to see a patient, as a resident he had authority to secure the patient into the hospital and to have the operating room made ready. Petitioner as a resident would make referrals to other departments *229 when he determined that the problem did not involve his specialty, usually without consulting with his attending physician. Petitioner as a resident would record his impressions of the problem and the treatment given each patient who came to the emergency room on a sheet which is maintained for each patient. As a plastic surgeon resident, petitioner was obligated to his attending physician who was responsible for the patients to make sure that things were in order, that the charts recorded that the attending physician had seen the patient, what the impressions of the attending physician and resident were, what were the results of laboratory reports, and that the treatment was being administered correctly. If there was a question as to medication, petitioner as a resident would endeavor to make a decision and only when he was uncertain would he call the attending physician. If there was a change in the patient's postoperative condition, the resident would record this change and any minor alteration he or the attending physician might have made in the treatment of the patient on the "progress note." These documents are part of the patient's chart which is signed by the resident. *230 This chart becomes a permanent hospital record. Writing up the charts by the resident saved the attending physicians' time. A resident would complete and sign death certificates with respect to patients who died in the hospital. A general surgery resident while rotating on the Pathology Department staff would witness autopsies. Residents would draft and proofread required case summaries of patients before they were signed by the attending physician.These would become part of the patients' records and a permanent record of the hospital. Petitioner occasionally discharged patients from the hospital without consulting with the attending physician. Petitioner as a resident changed patients' dressings. Petitioner as a resident formally taught on one occasion a group of nurses on emergency resuscitation at the request of the Nursing Department. Otherwise his teaching duties were informal in that he would answer questions or instruct hospital personnel who happened to be in his presence. Any physician practicing in the State of Wisconsin could refer a patient to University Hospitals and admit such patient into the hospital. When the patient came to the outpatient clinic *231 and was admitted, the patient became the responsibility of the attending physician holding clinic that day and was assigned to that attending physician's ward. However, if the referring physician requests a specific attending physician to be responsible for the particular patient, the patient will be assigned to that attending physician unless it is an emergency situation, in which case whatever attending physician is available or on call will administer treatment. On his 1968 Federal income tax return petitioner claimed an educational expense deduction in the amount of $3,600 attributable to the stipend which he received from University Hospitals in that year. Respondent, in his statutory notice of deficiency, treating the deduction claimed as an exclusion, included the $3,600 in petitioners gross income stating that it has not been established that the amount received "qualifies as a scholarship or fellowship grant excludable under Sec. 117 of the Internal Revenue Code." OPINION Although on his return for his calendar year 1968 petitioner claimed an educational expense deduction of $3,600 attributable to the stipend he received from University Hospitals, *232 he claimed at trial that the $3,600 was properly excludable from his gross income as a fellowship grant under section 117. Section 117(a)[2] provides, in the case of an individual, that gross income does not include any amount received "as a scholarship at an educational institution" or "as a fellowship grant." If the amount received is a scholarship or fellowship, then section 117(b) (2)[3] operates to limit the amount of the exclusion available to nondegree candidates who have received amounts from grantors described in section 117(b) (2) (A) "to an amount equal to $300 times the number of months for which the recipient received amounts under the scholarship or fellowship grant during such taxable year * * *" up to 36 months. *233 The grantor under the facts here is University Hospitals which respondent recognizes is of the type of grantor permitted under section 117(b) (2) (A) as it is exempt from tax under section 501(a) by section 501(c) (3). Petitioner contends he is entitled to exclude $3,600 as a fellowship grant under section 117(a) (1) (B) for his taxable year 1968. Respondent contends petitioner is not entitled to the claimed exclusion for that year as the stipend received from University Hospitals was not a fellowship grant within section 117 but compensation for services performed by petitioner. Alternatively, respondent contends that if we should determine that petitioner may exclude a portion of his stipend income, the exclusion would be allowable only during the first 6 months of 1968, by virtue of the 36 months limitation under section 117(b) (2) (B). Petitioner, to come within the exclusionary provisions of section 117(a) (1) (B), must establish that the monies he received as a stipend are a fellowship grant within the meaning of section 117. Section 1.117-3(c), Income Tax Regs. *234 , provides in part as follows: Fellowship grant. - A fellowship grant generally means an amount paid or allowed to, or for the benefit of, an individual to aid him in the pursuit of study or research. * * * Section 1.117-4, Income Tax. Regs., provides in part as follows: Items not considered as scholarships or fellowship grants. The following payments or allowances shall not be considered to be amounts received as a scholarship or a fellowship grant for the purpose of section 117: * * * (c) Amounts paid as compensation for services or primarily for the benefit of the grantor. (1) * * * any amount paid or allowed to, or on behalf of, an individual to enable him to pursue studies or research, if such amount represents either compensation for past, present, or future employment services or represents payment for services which are subject to the direction or supervision of the grantor. (2) Any amount paid or allowed to, or on behalf of, an individual to enable him to pursue studies or research primarily for the benefit of the grantor. However, amounts paid or allowed to, or on *235 behalf of, an individual to enable him to pursue studies or research are considered to be amounts received as a scholarship or fellowship grant for the purpose of section 117 if the primary purpose of the studies or research is to further the education and training of the recipient in his individual capacity and the amount provided by the grantor for such purpose does not represent compensation or payment for the services described in subparagraph (1) of this paragraph. Neither the fact that the recipient is required to furnish reports of his progress to the grantor, nor the fact that the results of his studies or research may be of some incidental benefit to the grantor shall, of itself, be considered to destroy the essential character of such amount as a scholarship or fellowship grant. In Bingler v. Johnson, 394 U.S. 741, 750-1 (1969), the United States Supreme Court upheld the validity of section 1.117-4(c), Income Tax Regs., "comporting as they do with the ordinary understanding of "scholarships' and "fellowships' as relatively disinterested, "no-strings' educational grants, with no requirement of any substantial quid pro quo from the *236 recipients." In the Johnson case, footnote 32, the Court noted that section 1.117-4(c) (2), Income Tax Regs., promulgated to impose a tax on bargained-for arrangements that do not create an employer-employee relationship but where the recipient receives money and in return provides a quid pro quo, was merely an adjunct to and not a replacement of the compensation provision under section 1.117-4(c) (1), Income Tax Regs.
The standard as pronounced in the regulations for determining whether or not the stipend received by petitioner was a fellowship is the purpose for which the payments were made. If the primary purpose of the payment is a relatively disinterested grant to further the education and training of the recipient in his individual capacity, it is excludable from recipient's gross income as a fellowship. If the primary purpose of the payment is to reward, induce or compensate the recipient for his past, present or future services which directly benefit the grantor, then it is not excludable from recipient's gross income as it is not a fellowship. Frederick Fisher, 56 T.C. 1201 (1971); Irwin S. Anderson, 54 T.C. 1547(1970). *237 As stated in Bingler v. Johnson, supra, the question for decision is whether the payment was made on a quid pro quo basis. This is a factual question to be determined from the circumstances of each particular case. Stephen L. Zolnay, 49 T.C. 389 (1968). After reviewing the facts in this case we conclude that the payments to petitioner were compensation for services that he performed at University Hospitals and Madison General Hospital, both while he was a general surgery and a plastic surgery resident. Petitioner provided extensive and valuable services to University Hospitals and Madison General Hospital as a general surgery resident and to University Hospitals as a plastic surgery resident. At University Hospitals petitioner as a general surgery and plastic surgery resident made formal and informal rounds, saw patients in the emergency room and the outpatient clinic, drafted case summaries, signed death certificates, proposed diagnosis and treatment, gave preoperative and postoperative care, and assisted in or performed surgery. At Madison General, petitioner as a resident performed surgical operations. In carrying out his duties, petitioner was *238 responsible to the attending physician and usually acted under the direct supervision of such attending physician. For this reason petitioner apparently was of the view that his services, though valuable, were only services for the attending physicians and not for the grantor, University Hospitals. [4] Petitioner, however, in this view overlooks the fact that the attending physicians render patient care, that patient care is a prime function of University Hospitals and that the services of the residents are responsible for better patient care. The facts in this case indicate that the purpose of the payments received by petitioner from University Hospitals was compensation for services rather than disinterested *239 no-strings grants for study and research. See Aloysius J. Proskey, 51 T.C. 918 (1969); Stephen L. Zolnay, supra; Woddail v. Commissioner, 321 F.2d 721 (C.A. 10, 1963), affirming a Memorandum Opinion of this Court; Ethel M Bonn, 34 T.C. 64 (1960). Cf. George L. Bailey, 60 T.C. 447 (1973); Thomas P. Phillips, 57 T.C. 420 (1971). The raison d'etre of Madison General, a private hospital, was service to its patients. University Hospitals had a dual purpose for being, that of teaching students, interns, nurses and physicians and of caring for patients, but its functions were primarily oriented towards providing patient care as the "Procedural Manual for Interns and Residents" stated that "patients are our main concern." While we agree with petitioner that the raison d'etre of the hospital is not a "determining" factor as to the purpose of the payment to petitioner, it is still a relevant factor. As these hospitals functioned to provide care, and residents assisted in providing care, it is more likely that the purpose of the payment to petitioner was compensation for his services of providing care to *240 the hospitals' patients rather than a disinterested educational grant. Aloysius J. Proskey, supra.
A further factor indicating an employee-employer relationship between University Hospitals or Madison General and petitioner is the financial arrangements made between them. Petitioner argues that in determining the purpose for the payment of the stipend we should disregard the manner of the payment. We do not agree. While it is certainly not controlling, the financial arrangements between petitioner and the hospital are usually indicative of the purpose of the payment. On his initial appointment petitioner was required to undergo a physical examination, as did all University Hospitals employees. Petitioner, as a member of the "house staff" of University Hospitals, was paid from University Hospitals' operating budget, University Payroll Account No. 136, and University Hospitals withheld Federal income and social security taxes. By comparison, gifts and grants in aid were paid from a separate payroll account. Worthington v. Commissioner, 476 F.2d 589, 590 (C.A. 10, 1973), affirming a Memorandum Opinion of this Court. The stipend was not based on the *241 financial need of petitioner. Compare Robert Henry Steiman, 56 T.C. 1350, 1355 (1971), with Edward A. Jamieson, 51 T.C. 635, 639 (1969). The stipend was based on years of service and with each additional year the stipend increased, reflecting petitioner's increasing value to University Hospitals and Madison General as a surgeon. University Hospitals did not permit its residents to engage in the private practice of medicine without permission. Madison General was billed by University Hospitals for payroll payments, including withholding and social security taxes, for its residents who were working on rotation at Madison General. Petitioner was provided with "fringe benefits" which are normally associated with an employee-employer relationship. Irwin S. Anderson, supra; Aloysius J. Proskey, supra.Cf. Thomas P. Phillips, supra.Petitioner as a resident of University Hospitals received hospitalization insurance, medical care, a 1-month paid vacation each year, paid leave for military duty, malpractice insurance, and laundry service. These benefits are not of the type which are normally associated with the term *242 "fellowship grant." See Elmer L. Reese, Jr., 45 T.C. 407 (1966), affirmed per curiam 373 F.2d 742 (C.A. 4, 1967). Petitioner has emphasized that his primary purpose for being a surgery resident was to acquire the knowledge and skill required to be certified as a plastic surgeon. However, his purpose is only relevant to the excludability of his stipend insofar as it might possibly shed light on the purpose of the payment by the grantor. As this Court said in Stephen L. Zolnay, supra, at 399: [The] fact that he was able to kill two birds with one stone - in the sense that he could derive both direct educational and financial benefit - does not mean that he was being paid to study rather than to work. * * * Similarly, as this Court said in Aloysius J. Proskey, supra, at 925: There can be no serious doubt that work as a resident physician provides highly valuable training, particularly in preparing for specialties in the various fields of medicine. Yet virtually all work as an apprentice, whether in medicine or law, carpentry or masonry, provides valuable training. Nothing in section 117 requires that an amount paid as *243 compensation for services rendered be treated as a nontaxable fellowship grant, merely because the recipient is learning a trade, business, or profession. * * * Under the facts here we determined that the purpose of the payment by University Hospitals to petitioner was compensation for services rendered by petitioner, even though we recognize that petitioner's primary purpose in being a resident was to further his education. Although University Hospitals and Madison General might have functioned without residents the facts show that these hospitals could not have cared for their patients as efficiently without the residents' assistance, as the residents performed substantial and valuable services to these hospitals. Additionally, as this Court said in Frederick Fisher, supra, at 1215: More fundamentally, even if the Center could do without residents, it did not do without them; it used their services, and it paid for them. Many employees may be dispensable in the sense that their employers could "operate" without them. But such dispensability hardly renders their salaries noncompensatory. Petitioner urges that the stipend paid him as a plastic surgery resident *244 should not be considered as compensation as the stipend would have continued even if he was not present at University Hospitals due to his rotation to the Mayo Clinic or Passavant Hospital. The short answer is that petitioner was not on rotation to these hospitals in the year before us. Furthermore, there is indication in the record that these hospitals rotated their residents to University Hospitals on a reciprocal basis so that each hospital received an equal benefit from the rotation. Even if this were not the situation, the possibility that University Hospitals might in some future year rotate petitioner to a hospital from which it did not receive compensation in money, or by the rotated services of another resident, does not overcome the strong evidence in support of our finding that the purpose of the payments by University Hospitals to petitioner was compensatory. This record shows that prior to the beginning of his plastic surgery residency in the latter half of 1968 petitioner had received payments as a general surgery resident for the prior 36 months. Respondent argues that in any event the payments to petitioner for the last 6 months of 1968 should not be excluded *245 if we conclude that the general surgery stipend payments were excludable from petitioner's income when received. See section 1.117-2(b) (2) (ii), Income Tax Regs.
Petitioner argues that this is an issue raised by respondent on brief. In any event, having concluded on the basis of all the evidence presented that none of the stipend payments received by petitioner during 1968 was a fellowship grant but rather was compensation for services rendered, we do not reach this issue. We hold that the stipend payments made to petitioner during the year in controversy were taxable income to petitioner and no portion of these payments was excludable under section 117. Decision will be entered for respondent. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954. ↩
2. SEC. 117. SCHOLARSHIPS AND FELLOWSHIP GRANTS. (a) General Rule. - In the case of an individual, gross income does not include - (1) any amount received - (A) as a scholarhip at an educational institution (as defined in section 151(e) (4)), or (B) as a fellowship grant, including the value of contributed services and accommodations; * * * ↩
3. Sec. 117(b) Limitations. - * * * (2) Individuals who are not candidates for degrees. - In the case of an individual who is not a candidate for a degree at an educational institution (as defined in section 151(e) (4)), subsection (a) shall apply only if the condition in subparagraph (A) is statisfied and then only within the limitations provided in subparagraph (B). (A) Conditions for exclusion. - The grantor of the scholarship or fellowship grant is - (i) an organization described in section 501(c) (3) which is exempt from tax under section 501(a), * * * (B) Extent of Exclusion. - The amount of the scholarship or fellowship grant excluded under subsection (a) (1) in any taxable year shall be limited to an amount equal to $300 times the number of months for which the recipient received amounts under the scholarship or fellowship grant during such taxable year, except that no exclusion shall be allowed under subsection (a) after the recipient has been entitled to exclude under this section for a period of 36 months (whether or not consecutive) amounts received as a scholarship or fellowship grant while not a candidate for a degree at an educational institution (as defined in section 151(e) (4)↩). 4. The record shows that in return for the services of residents at Madison General, Madison General contributed financial support to the residency programs at University Hospitals and was billed for payments made by University Hospitals to its residents while such residents were engaged in duties at Madison General. Therefore, neither party distinguishes between petitioner's services at Madison General and University Hospitals as to whether the services were to the grantor. ↩