R. M. NUGENT, JR., ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Nugent v. Commissioner
Docket Nos. 2132-70, 2135-70, 8542-71, 6013-71, 7505-71.
United States Tax Court
T.C. Memo 1974-161; 1974 Tax Ct. Memo LEXIS 158; 33 T.C.M. (CCH) 690; T.C.M. (RIA) 74161; June 20, 1974, Filed. *159 Rufus Wallingford and Herbert S. Kendrick, for the petitioners. Samuel W. Graber, for the respondent. QUEALY
MEMORANDUM FINDINGS OF FACT AND OPINION QUEALY, Judge: Respondent determined the following deficiencies in income tax in these consolidated cases: $ Docket No.
Petitioners
Taxable Year
Deficiency 2132-70
R. M. Nugent, Jr.
1967
$ 866.00
2135-70
R. M. Nugent, Jr. and Mrs. Sylvia Nugent
1968
1,268.59
8542-71
R. M. Nugent, Jr. and Mrs. Sylvia Nugent
1969
1,618.58
6013-71
Stanley A. Lightfoot and Barbara A. Lightfoot
1968
717.60
7505-71
H. P. Clifton, Jr. and Patricia M. Clifton
1968
861.45
7505-71
H. P. Clifton, Jr. and Patricia M. Clifton
1969
900.03
During the respective year or years in question, petitioners R. M. Nugent, Jr., Stanley A. Lightfoot, and H. P. Clifton, Jr., each received certain monies for his participation in the Southwestern Medical School Affiliated Hospitals Residency Program for pathologists. The sole question before the Court is whether any of such amounts are excludable from gross income as scholarship or fellowship grants under the provisions of section 117. [2]
*160 Due to the identity of issue and circumstance, petitioners Stanley A. Lightfoot and H. P. Clifton, Jr., have chosen not to bring their cases to trial before this court. Instead, they have agreed by stipulation with respondent to accept this Court's findings of fact and conclusions of law with respect to petitioner R. M. Nugent, Jr., as determinative of the identical issue in their cases, and have further agreed that the decision in their cases may be entered accordingly. FINDINGS OF FACT Some of the facts have been stipulated. Such stipulations and the exhibits attached thereto are incorporated herein by this reference. Petitioner in docket No. 2132-70 is R. M. Nugent, Jr., whose legal residence at the time of the filing of the petition herein was Dallas County, Texas. R. M. Nugent, Jr., filed a timely individual income tax return for the taxable year 1967. Petitioners in docket Nos. 2135-70 and 8542-71 are R. M. Nugent, Jr. (hereinafter referred to as "Dr. Nugent" or "petitioner") and his wife, Sylvia Nugent, whose legal residence at the time of the filing of the petitions herein was Dallas County, Texas, and Riverside County, California, respectively. [3] Dr. Nugent *161 and his wife filed timely joint Federal income tax returns for the taxable years 1968 and 1969. The legal residence of Stanley A. Lightfoot and his wife, Barbara A. Lightfoot, petitioners in docket No. 6013-71, was Tyler, Texas, at the time of the filing of the petition herein. They filed a timely joint Federal income tax return for the taxable year 1968. The legal residence of H. P. Clifton, Jr., and his wife, Patricia M. Clifton, petitioners in docket No. 7505-71, was Lubbock, Texas, at the time of the filing of the petition herein. They filed timely joint Federal income tax returns for the taxable years 1968 and 1969. Dr. Nugent graduated from the University of Texas Southwestern Medical School (hereinafter referred to as "Southwestern"), Dallas, Texas, in June of 1967. During the taxable years 1967, 1968, and 1969, Dr. Nugent served first as an intern and subsequently as a resident in pathology at Parkland Memorial Hospital (hereinafter referred to as "Parkland") under the Southwestern Medical School Affiliated Hospitals *162 Residency Program (hereinafter referred to as "SRP"). Parkland is one of several hospitals in the Dallas area participating in the SRP and serves as the primary teaching facility of Southwestern. Parkland, in conjunction with Woodlawn Hospital constitutes what is known as the Dallas County Hospital District (hereinafter referred to as "DCHD"). The DCHD is a public body created and organized under the laws of the State of Texas primarily for the purpose of supplying medical care to indigent and needy residents of Dallas County. The stated objectives of the DCHD, as reflected in its bylaws, are as follows: (a) To provide hospital facilities and care on an in-patient, out-patient and emergency basis for the medically indigent citizens of the County of Dallas, Texas, regardless of race, creed or nationality; and, in certain instances, to extend such facilities, in an emergency, to individuals who are not legal residents of the County of Dallas, Texas. Further, to provide hospital facilities for a limited number of pay patients as require the facilities offered by the Hospital District. (b) To carry on a program of intern and resident education for graduate medical students *163 and, at the same time, avail itself of the services of these physicians for the care of the indigent sick. * * * Pursuant to a contractual arrangement entered into in 1967 between the DCHD and the Board of Regents of the University of Texas acting on behalf of Southwestern, it was agreed that Southwestern would staff Parkland and Woodlawn hospitals in exchange for the opportunity to use the hospitals for clinical teaching and research. By such arrangement, the DCHD hoped to achieve one of the primary objectives of its charter, to offer high quality medical care to sick or injured indigent pateints in its district. In accordance with the above agreement, the permanent staff at Parkland is drawn directly from the faculty of Southwestern, and the doctors who serve as heads of the departments, divisions, or services of Southwestern, assume the same positions of authority at Parkland. The interns and residents at Parkland are appointed by the DCHD upon the nomination of the chiefs of the appropriate department, division, or service responsible for the supervision and training of such personnel. The expense of hiring such interns or residents is borne entirely by the DCHD although *164 Southwestern assists where it is able to obtain special funds for the training programs of certain interns and residents. Under the SRP, the resident-intern is required to divide his time equally between the two major areas of pathology, anatomic pathology and clinical pathology. Anatomic pathology deals with the changes in tissue as visualized in an anatomic fashion, either from visual inspection or from microscope examination. Clinical pathology is the detection of disease through its manifestations as mirrored in the blood, urine, or other body excreta or fluid. The pathologist, being concerned primarily with the laboratory aspects of medicine, usually has neither the authority to admit or discharge patients, nor any direct relationship with any patients. His function is to render consulting services to other doctors who have primary responsibility for patients. In this sense, he is regarded by the medical profession as the doctor's doctor. During the years in question, Dr. Nugent spent 50 percent of his time at Parkland performing autopsies and conducting tests in surgical pathology, which were assigned strictly on the basis of rotation. Autopsy involved the dissection *165 of a corpse to confirm or perhaps discover a diagnosis or cause of death. Surgical pathology, which encompasses cytology, consists of three distinct areas: (a) examination of biopsy tissue, or the removal of a small piece of tissue for diagnosis from a living patient; (b) specimens associated for quick diagnosis, especially at the operating room; and (c) other cases that require more elaborate kinds of study. At least initially, Dr. Nugent would perform these duties under the supervision of a permanent staff pathologist. Dr. Nugent would write up a report and diagnosis based on his examination and tests which would be subject to review and approval by a faculty staff member. The latter would be responsible for issuing the official diagnosis and report to the attending physician. If the findings are significant, they are presented at conferences to other residents and staff. The residents who performed the autopsy or biopsy would help prepare material for the conference. In the absence of residents and interns, the autopsies and surgical biopsies would have had to be performed by the faculty of Southwestern who staffed Parkland. Petitioner estimated that he performed approximately *166 200 autopsies during his tenure at Parkland. Dr. Vernie A. Stembridge, Chairman of the Department of Pathology at Southwestern, estimated that autopsies and surgical pathology examinations could be performed by the permanent staff in less than half the time as it took residents and interns in conjunction with the training program. Thus, without the residency program, fewer personnel would be needed to handle the pathology services at Parkland. Petitioner spent the balance of his internship and residency on the clinical aspects of pathology, which are principally of a laboratory nature. This area of pathology encompasses hematology or the study of blood; the chemical examination of blood, urine, and other body fluids; and various other kinds of laboratory procedures such as serology and bacteriology. Petitioner would acquaint himself with the procedure, equipment and techniques used in making an analysis in each of these areas. He would observe and monitor work of technologists in charge of making up the results that would eventually be transmitted to the patient's chart. He would duplicate laboratory tests and run tests of his own. His tests and analysis would be reviewed *167 by a staff faculty member. Whenever petitioner was assigned to a particular rotation, either in the anatomic or clinical area, he was required to attend any conferences involving that area. During the years in question, over 1,200 complete autopsies, 300,000 anatomical tests, and 4,800,000 pathological tests were performed at the DCHD. The training petitioner received at Parkland ultimately led to his certification by the American Board of Pathology as an anatomic and clinical pathologist. During each of his years at Parkland, both as an intern and a resident, Dr. Nugent was under contract with the hospital. By the terms of the contract, he agreed to "conform to all rules and regulations governing the institution, and discharging all duties of House Staff Officer as determined by the Management and Staff." [4] Upon satisfactory completion of his duties as a resident or intern, Parkland agreed to issue a certificate indicating satisfactory performance of such duties. Such certificate would be forfeited if he failed to remain in service for the full time of his contract. The contract further provided that Dr. Nugent was prohibited from engaging in any form of private practice *168 except in those instances which had been given prior approval and which applied to all members of the house staff. Throughout the years in question, Dr. Nugent recieved certain monthly sums of money from both the DCHD and Southwestern for his participation in SPR. Neither the amounts paid by the DCHD nor the amounts paid by Southwestern were determined on the basis of financial need, but were instead based on a fixed sum for each level of residency, increasing yearly as the resident attained additional skills and experience. [5]
Federal income and FICA taxes were withheld on Dr. Nugent's monthly payments from the DCHD, and the employee records kept by the DCHD reflected an hourly wage rate and a specific job code number for petitioner. Dr. Nugent recieved 2 weeks vacation per year, free hospitalization coverage and medical care, a meal allowance *169 from Parkland, and was eligible to join the DCHD employees credit union. The primary source of operating funds for the DCHD was ad valorem taxes. The DCHD, however, also derived funds from payments made by the Social Security Administration Medicare Program (hereinafter referred to as "SSA") on behalf of patients who qualified for hopsital benefits under that program. [6] In submitting its reimbursable costs to SSA, the DCHD included the cost of services rendered to such patients by pathology residents and interns. A portion of the funds received from SSA were transmitted to Southwestern where they were allocated among different departments of the hospital. The funds received by petitioner from Southwestern came from that school's Department of Pathology. The Department of Pathology recieves its funds from various sources, including certain amounts from the DCHD for services rendered to patients at Parkland by the faculty which were at least partially paid for by SSA. [7] The Chairman of the Department *170 is in charge of supervising the disbursement of such funds. In 1969, petitioner had additional income from outside sources in the amount of $9,571.77. The major part of such income was derived from the performance of autopsies for the County of Dallas as its forensic pathologist, for which he was paid $75 per autopsy. He also performed autopsies for Children's Medical Center in Dallas at $50 per autospy. He was paid for his services at Children's as a result of that hospital not having any residents assigned there. The remaining amounts reflect payments received for covering the private practice of a pathologist in Amarillo, Texas, during petitioner's vacation time for which he was paid $150 per day. On his 1967, 1968, and 1969 income tax returns, petitioner excluded from income $3,600 of the amounts he received each year for his participation in SRP. Respondent has determined such amounts are not excludable from income. OPINION The sole issue for our decision is whether the amounts received by petitioner from the DCHD and Southwestern in each of the *171 taxable years 1967, 1968, and 1969 for his participation in the SRP for pathologists are excludable from gross income as "fellowship grants" under section 117. The resolution of this issue will determine whether petitioners Stanley A. Lightfoot and H. P. Clifton, Jr., are likewise entitled to exclude from gross income entitled to exclude from gross income amounts received for their participation in SRP. Section 117 excludes from gross income any amount, with certain limitations, received as a "fellowship grant." [8] The statute itself fails to define the meaning of such term. Section 1.117-3(c), Income Tax Regs., however, defines "fellowship grant" as "an amount paid or allowed to, or for the benefit of, an individual to aid him in the pursuit of study or research." Section 1.117-4(c), Income Tax Regs., further provides that amounts paid as compensation for services or primarily for the benefit of the grantor are not to be considered as fellowships for purposes of section 117: *172 (c) Amounts paid as compensation for services or primarily for the benefit of the grantor. (1) Except as provided in paragraph (a) of § 1.117-2, any amounts paid or allowed to, or on behalf of, an individual to enable him to pursue studies or research, if such amount represents either compensation for past, present, or future employment services or represents payment for services which are subject to the direction or supervision of the grantor. (2) Any amount paid or allowed to, or on behalf of, an individual to enable him to pursue studies or research primarily for the benefit of the grantor. However, amounts paid or allowed to, or on behalf of, an individual to enable him to pursue studies or research are considered to be amounts received as a scholarship or fellowship grant for the purpose of section 117 if the primary purpose of the studies or research is to further the education and training of the recipient in his individual capacity and the amount provided by the grantor for such purpose does not represent compensation or payment for the services described in subparagraph (1) of this paragraph. Neither the fact that the recipient is required to furnish reports of his *173 progress to the grantor, nor the fact that the results of his studies or research may be of some incidental benefit to the grantor shall, of itself, be considered to destroy the essential character of such amount as a scholarship or fellowship grant. The Supreme Court in Bingler v. Johnson, 394 U.S. 741, 751 (1969), upheld the validity of these regulations as reflecting "the ordinary understanding of "scholarships' and "fellowsings' as relatively disinterested, "no-strings' educational grants, with no requirement of any substantial quid pro quo from the recipients." The crucial test of the above regulations is whether the primary purpose of the amounts paid is to further the education and training of the recipient or to compensate him for services rendered. Elmer L. Reese, Jr., 45 T.C. 407, 411 (1966) affirmed per curiam 373 F.2d 742 (C.A. 4, 1967). More succinctly, the basic question is whether the taxpayer was "paid to work or paid to study." Stephen L. Zolnay, 49 T.C. 389 (1968). On the basis of the facts presented, we find *174 that the petitioner was paid to work and that the primary purpose of the amounts received by petitioner from the DCHD and Southwestern for his participation in the SRP was to compensate him for services rendered at Parkland. Throughout his internship and residency at Parkland, petitioner was under formal contract with the hospital and subject to the hospital's directives as to the duties he was required to perform. If petitioner did not perform such duties satisfactorily or if he failed to remain at the hospital for the full duration of his contract, he forfeited his right to receive a certificate from Parkland indicating satisfactory performance of such duties. In addition, he was prohibited from engaging in private practice except with the permission of the hospital. We cannot infer a disinterested, "no strings attached" motive on the part of Parkland in entering this type of contractual arrangement. Instead, it is apparent that Parkland viewed the SRP and the residents which were made available to it under this program as the primary means of fulfilling one of the most important functions of the DCHD, to provide high quality medical care to indigent patients within its district. *175 The services petitioner performed at Parkland were of a substantial benefit to the hospital. Fifty percent of petitioner's time was spent performing autopsies and surgical biopsies from which he would prepare reports and make diagnoses. Although these reports were reviewed by a permanent staff or faculty member, who would take primary responsibility for issuing an official diagnosis to the attending physician, it is apparent that the more proficient petitioner became in these tasks the more perfunctionary was the staff involvement. The mere fact petitioner was able to command $75 per autopsy from the County of Dallas when working part-time as its forensic pathologist attests to the true value of his services. Petitioner argues that the educational character of the program is reflected by the fact that fewer personnel would have been required to perform pathological services at Parkland had there been no residency program. As this Court said in Frederick Fisher, 56 T.C. 1201 (1971), at 1215: More fundamentally, even if the Center could do without residents, it did not do without them; it used their services, and it paid for them. Many employees may be dispensable *176 in the sense that their employers could "operate" without them. But such dispensability hardly renders their salaries noncompensatory. Although the services petitioner performed in the clinical area of pathology were more of a duplicative and observatory nature, it is not so much what petitioner was permitted to do by Parkland but what Parkland could have asked petitioner to do under the terms of their contractual arrangement. Clearly, petitioner was bound to perform any duties assigned to him by the hospital. We do not doubt that petitioner derived substantial educational experience from his residency training. In Aloysius J. Proskey, 51 T.C. 918, 925 (1965), this Court said: There can be no serious doubt that work as a resident physician provides highly valuable training, particularly in preparing for specialties in the various fields of medicine. Yet virtually all work as an apprentice, whether in medicine or law, carpentry or masonry, provides valuable training. Nothing in section 117 requires that an amount paid as compensation for services rendered be treated as a nontaxable fellowship grant, merely because the recipient is learning a trade, business, or *177 profession. Whatever training petitioner received during the years of his residency - and we do not deny that it was substantial - was merely "incidental to and for the purpose of facilitating the raison d'etre of the Hospital, namely, the care of its patients." Ethel M. Bonn, 34 T.C. 64, 73 (1960); Woddail v. Commissioner, supra. * * * Our conclusion as to the compensatory nature of the relationship between petitioner and Parkland is further buttressed by the fact that the amounts paid for petitioner's participation in SRP had no relationship to the participant's financial needs. This has been one of the hallmarks of fellowship grants. Aloysius J. Proskey, supra.Instead, the amounts apid here by both the DCHD and Southwestern were based on a fixed sum for participation in the SRP, increasing yearly as the resident attained additional skills and experience. Petitioner was also provided with "fringe benefits" which are normally associated with an employment relationship. Irwin S. Anderson, 54 T.C. 1547 (1970). He received two weeks vacation per year, free hospitalization coverage and medical care, a meal allowance from Parkland and *178 the right to join the DCHD employees credit union. Federal income tax and FICA taxes were withheld on Dr. Nugent's monthly payments from the DCHD. Petitioner argues that since the services he performed for Parkland did not involve any responsibility for the direct treatment or care of patients, his situation is distinguishable from services rendered under the typical residency program. The petitioner ignores the fact that pathology by its very nature is a specialty which involves no direct patient contact. Moreover, it is well recognized that the services rendered by the pathologist in the hospital context form a vital and integral part of the treatment and diagnosis of patients since it is upon such services that the attending physician relies in making his diagnosis. In accordance with the above, Decision will be entered for the respondent in dockets Nos. 2132-70, 2135-70, 8542-71, 6013-71, and 7505-71. Footnotes
1. The cases of the following petitioners are consolidated herewith: R. M. Nugent, Jr. and Mrs. Sylvia Nugent, docket Nos. 2135-70 and 8542-71; Stanley A. Lightfoot and Barbara A. Lightfoot, docket No. 6013-71; H. P. Clifton, Jr. and Patricia M. Clifton, docket No. 7505-71. ↩
2. All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated. ↩
3. Sylvia Nugent is a party in the proceeding only by virtue of having filed a joint Federal income tax return with her husband, R. M. Nugent, Jr. ↩
4. The term "House Staff Officer" is commonly used to refer to residents and interns. ↩
5. Petitioner's monthly allowance from the DCHD increased from $260 to $380 to $455, respectively, during his first 3 years at the hospital while his monthly allowances from Southwestern increased from $50 to $75 to $150 during such period.↩
6. Of the $20,448,488 in operating funds the DCHD had for 1969, approximately 38 percent was derived from patient services while 58 percent was derived from ad valorem taxes. ↩
7. The major portion of the Department's funds are derived from appropriations from the Texas State legislature. ↩
8. Since Dr. Nugent is a nondegree candidate, the exclusion available under sec. 117 is limited by sec. 117(b) (2) (B) "to an amount equal to $300 times the number of months for which the recipient received amounts under the scholarship or fellowship grant during such taxable year" up to 36 months. There is no dispute that both Southwestern and the DCHD qualify under sec. 117(b) (2) (A)↩ as grantors who are "exempt from tax under section 501(a)."