WILLIAM M. SWART, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Swart v. Commissioner
Docket No. 2580-74.
United States Tax Court
T.C. Memo 1978-38; 1978 Tax Ct. Memo LEXIS 472; 37 T.C.M. (CCH) 205; T.C.M. (RIA) 780038; January 30, 1978, Filed Scott R. Santerre, for the petitioner. Harry Beckhoff, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined a deficiency in petitioner's income tax for the calendar year 1971 in the amount of $114.70. The only issue for decision is whether the amount paid by the Rocky Mountain Osteopathic Hospital, Denver, Colorado, to petitioner as a resident in pathology was a fellowship grant under the provisions of section 117, Internal Revenue Code of 1954. [1]
FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioner, who was a resident of El Paso, Texas, at the time his petition in this case was filed, filed an individual Federal income tax return for the calendar year 1971 with the Ogden Service Center of the Internal Revenue Service. Petitioner is a Doctor of Osteopathy. He *474 graduated from the Kansas City College of Osteopathy and Surgery in 1958 and completed his internship at Phoenix General Hospital, Phoenix, Arizona, in 1959. Petitioner was licensed to practice as an osteopathic physician and surgeon in Arizona. Thereafter, petitioner engaged in general practice of osteopathy in Phoenix, Arizona, until approximately the end of February 1971. On March 1, 1971, petitioner entered into a contract with Rocky Mountain Osteopathic Hospital, Denver, Colorado, (hereinafter hospital) whereby he accepted an appointment as a resident in pathology for a one-year period beginning March 1, 1971, and ending February 29, 1972. The contract provided a stipend of $900 per month plus a $25 monthly increase semi-annually and a comparable increase which could be designated by the executive committee in the future. The contract further provided that the hospital would specify the conditions under which living quarters, meals and laundry service, or the equivalent of these, would be provided to petitioner. It also provided that the hospital would stipulate whether professional liability insurance and hospital and health insurance for the resident and his family would *475 be provided. By letters dated March 22, 1971, and July 1, 1971, the hospital agreed with respect to these items as follows: (1) To furnish meals, uniforms and personal laundry for petitioner; (2) effective July 1, 1971, to give petitioner a housing allowance of $100 monthly in addition to his monthly stipend with petitioner selecting his own living quarters off the hospital premises. The hospital was to act as lessee paying the lessor the entire rental amount as it became due. Any excess rental over the $100 allowance was to be deducted from petitioner's stipend by the hospital on a mutually agreeable schedule. In addition to the $100 housing allowance, the hospital agreed to pay utility and local telephone charges; (3) to provide professional liability insurance for petitioner as an employee of the hospital since, under the laws of the State of Colorado, residents are not licensed but are considered employees of the hospital; (4) to provide Blue Cross Hospitalization Insurance for petitioner and his family; (5) to allow petitioner two weeks vacation with pay during the year; and (6) to allow petitioner every other weekend off except if needed on an emergency basis *476 to cover for illness or emergency procedures. Under the contract, petitioner agreed to the following: B. THE RESIDENT AGREES: 1. To serve as a Resident in the field of Pathology during the entire period as specified above in this contract. 2. To perform all the duties assigned to him to the best of his ability, to maintain standards of professional competence as determined by the Hospital, and to conduct himself in a professional manner at all times. 3. To observe all rules and regulations of the Hospital and those of the American Osteopathic Association pertaining to Residents. 4. To engage during the entire period of this contract only in such activities of a professional nature as are approved by the Hospital and the Association. 5. To refrain during the entire period of this contract from engaging or participating in any nonprofessional activities that would interfere with his effective performance of this contract. In the contract the parties agreed with respect to termination of the contract by mutual consent of the parties, termination by the hospital upon failure of the resident to perform satisfactorily, basis of settlement of disputes between the *477 resident and the hospital, and that termination of the contract by the hospital without just cause shall be a basis for revocation of approval of the hospital for training of residents. The contract also incorporated by reference the "Requirements and Interpretative Guide for Hospitals Approved for Intern and/or Residency Training" of the American Osteopathic Association. Petitioner, as a resident, was classified by the hospital as house staff and provided with the benefits which were available to other house staff members which included, in addition to the items covered by the letters written pursuant to the contract, free parking, participation in the employees' credit union, vacation leave, free medical care for himself and his family, and annual postgraduate educational allowances for courses taken outside the hospital. Petitioner was furnished a "Wage and Tax Statement," Form W-2, by the hospital. Federal, state and city income taxes were withheld from petitioner's stipend and FICA contributions were also withheld from that stipend. The hospital is a nonprofit, nonsectarian, medical facility organized under the laws of the State of Colorado for the principal purpose of *478 providing patient care, research and teaching. It is an organization described in section 501(c)(3) which is exempt from Federal income taxes. It is not an educational organization described in section 170(b)(1)(A)(ii). The hospital is a short-term acute care general hospital providing medical, surgical, obstetrical and pediatric care for the Denver, Colorado, and surrounding areas.The hospital is principally funded from patient revenues plus minor grants from private foundations for equipment. Patients are admitted to the hospital solely on the basis of medical needs. During 1971, the hospital had a 174 bed capacity which included the nursery capacity of bassinets. During 1971, the hospital handled 6,376 admissions, 10,349 out-patient procedures, and 4,025 patients on an emergency basis. During that year the hospital was staffed by approximately 100 physicians, 2 residents, and 6 interns. One of the residents was a surgical resident and the other was petitioner, a resident in pathology. The Pathology Department of the hospital in which petitioner served his entire residency was staffed by one Pathologist (D.O.), one resident, and approximately 12 medical technologists. During *479 1971, the Pathology Department of the hospital performed 50 autopsies; handled 3,179 surgical pathology cases; and 2,345 cytologies. Stipends to residents of the hospital are fixed unilaterally by the hospital administration without regard to the resident's financial needs. Contracts between residents and the hospital are executed annually. The stipends are fixed at annual periods and are increased for length of service in accordance with the provisions of the contract entered into by the hospital and the resident. Reappointment of a resident is subject to the recommendation of the head of the department in which the resident serves. On March 1, 1972, petitioner entered into another one-year contract with the hospital as a second-year resident in pathology at an increased stipend.Petitioner and the hospital mutually terminated the second-year residency contract on July 1, 1972, because the chairman of the Pathology Department left the hospital and the program was discontinued. Thereafter, petitioner continued in his pathology training at a hospital in El Paso, Texas. Prior to March 1, 1971, the hospital had been authorized a training residency in pathology, but the program *480 had not been implemented and petitioner was the first and, at the date of the trial of this case, only trainee involved in that program at the hospital. The activities performed by petitioner at the hospital were subject to the constant direction, supervision, and control of the chairman of the Department of Pathology. His duties were specifically designated and increased progressively. Petitioner was assigned all cases which were presented to the Department of Pathology. Surgical pathology handled by petitioner involved tissues and materials taken from patients of the hospital. Autopsies performed in the hospital involved patients who died in the hospital. The duties of petitioner as the pathology resident of the hospital included conducting weekly seminars of a half hour to an hour's duration for medical students, interns, student nurses, and assistant residents. This activity required petitioner to spend 3 to 4 hours a week preparing for the lectures. During 1971 petitioner was primarily engaged in Anatomic Pathology and his duties generally consisted of observation of gross examinations, description, cutting, fixation, embedding, sectioning, and staining tissues for microscopic *481 examinations. Petitioner performed microscopic examinations of such tissues, and reported the results of such examinations. All of petitioner's microscopic examinations were reviewed by the chairman of the department. Petitioner and the chairman would discuss the diagnoses made by petitioner and the report would be dictated by the chairman and signed by both petitioner and the chairman. All reports prepared by petitioner were countersigned by the chairman of the Department of Pathology. During 1971, petitioner examined hundreds of cases involving surgical tissues and autopsies, and completed reporting all such examinations. During this year petitioner was involved in approximately 25 autopsies. All of the actual autopsies were performed by the chairman of the department and all autopsy reports dictated by him. However, petitioner performed microscopic examinations on tissues taken from the body during autopsy and the results of these examinations, after review by the department chairman, would generally be made part of the autopsy report. Petitioner would discuss and participate in the evaluation of the findings from the autopsy report. The autopsy reports were used as the basis *482 of preparing death certificates. In surgical pathological cases, the report of the gross examination and the microscopic examinations, which are required in approximately 90 percent of the surgical cases, after being completed, were given to the operating surgeon and the attending physician of the patient. Petitioner, in his work as a resident in pathology, had no direct patient contact. When the chairman of the Pathology Department of the hospital was on vacation during 1971, all tissues that were to be examined and diagnosed were sent to another hospital for such examination. The duties of petitioner as a pathology resident were not essentially different from those of the staff pathologist, except that any report prepared by petitioner required the countersignature of the department chairman to be official. As a general rule, a hospital would have one pathologist per 100-bed capacity. However, the Rocky Mountain Osteopathic Hospital had never in its history had but one pathologist on its staff and had had no resident except during the time petitioner was there. Petitioner as a resident was required to spend a minimum of 2,000 hours a year at the hospital or approximately *483 40 hours a week for 50 weeks. Petitioner's hours of duty generally began at 7:00 a.m. and ended at approximately 5:00 p.m. Residents were required to attend both hospital staff and departmental meetings and were assigned to observe and assist various hospital staff committees. In order to complete residency requirements in pathology, a minimum of 1,500 examinations of surgical tissue and the completion of reporting of 500 cases was required. It was also required that the resident assist in 100 autopsies and complete reporting of 30 such cases and examine 500 cytologies, completing reporting of 100 cases. During the year 1971, petitioner was not involved with any cytologies. Petitioner, as a pathology resident, was periodically evaluated as to his diagnostic proficiency by the staff pathologist. He was not regarded by the hospital as a "degree" candidate in an academic or university sense. During the taxable year 1971, petitioner received a stipend as a resident of the hospital in the amount of $9,724.89. He excluded $3,000 of this amount from income on his income tax return for the year 1971 as a fellowship grant. Respondent disallowed this claimed exclusion. OPINION
*484 Section 117, insofar as here pertinent, allows a $300 per month exclusion from the gross income to an individual not engaged in a degree program at a university from amounts received as a "fellowship grant" from an organization described in section 501(c)(3) which is exempt from Federal income tax. [2] The facts here show that petitioner was not engaged in a degree program and that the hospital that paid his stipend was an organization described in section 501(c)(3) which is exempt from Federal income tax. Petitioner has only claimed an exclusion of $300 per month. Therefore, the only issue between the parties is whether the amount paid to petitioner was received by him as a "fellowship grant" within the meaning of section 117. The statute itself does not define the term "fellowship grant." However, section 1.117-3(c), Income Tax Regs., defines this term as "an amount paid or allowed to, or for the benefit of, an individual to aid him in the pursuit of study or research. *485 Section 1.117-4(c)(2), Income Tax Regs., specifically provides that allowances shall not be considered as received as a scholarship or fellowship grant if the amounts are paid as compensation for services or primarily for the benefit of the grantor. This section of the regulations further states that amounts paid or allowed to an individual to enable him to pursue studies or research are considered to be received as a scholarship or fellowship grant-- If the primary purpose of the studies or research is to further the education and training of the recipient in his individual capacity and the amount provided by the grantor for such purpose does not represent compensation or payment for the services * * *. Additionally, this regulation states that-- Neither the fact that the recipient is required to furnish reports of his progress to the grantor, nor the fact that the results of his studies or research may be of some incidental benefit to the grantor shall, of itself, be considered to destroy the essential character of such amount as a scholarship or fellowship *486 grant. The validity of these regulations was upheld in Bingler v. Johnson,394 U.S. 741, 757-8 (1969). In so holding, the Supreme Court pointed out that-- The thrust of the provision dealing with compensation is that bargained-for payments, given only as a "quo" in return for the quid of services rendered--whether past, present, or future--should not be excludable from income as "scholarship" funds. [Fn. ref. omitted.] * * * The question in this case, therefore, is whether the facts here present show the primary purpose of the payments by the hospital to petitioner to be to enable petitioner to pursue studies or research to further his education and training in his individual capacity or whether these payments were primarily for the services rendered by petitioner. Clearly here, as in numerous other cases involving medical or surgical interns and residents of hospitals (see Weinberg v. Commissioner,64 T.C. 771, 776-777 (1975) and cases there cited), the agreement which petitioner had with the hospital has all the indicia of an employer-employee relationship. Petitioner agreed to perform the duties assigned to him, to observe *487 the rules and regulations of the hospital, to engage only in activities of a professional nature approved by the hospital, and to regrain from engaging in any nonprofessional activities which would interfere with his performance for the hospital. The record shows that in all respects petitioner was treated as a member of the staff and an employee of the hospital as far as his contractual relations with the hospital were concerned.Petitioner was provided with the same "fringe benefits" as other employees of the hospital, including a 2-week vacation, hospitalization, and medical care. The hospital withheld state and Federal income taxes and FICA taxes from the payments made to petitioner. The amount paid to petitioner had no relation to petitioner's financial needs. All these aspects of employment have in various cases been held to indicate that the relationship between the recipient of a payment and the grantor was that of employer and employee. See Proskey v. Commissioner,51 T.C. 918 (1969); Anderson v. Commissioner,54 T.C. 1547 (1970); Fisher v. Commissioner,56 T.C. 1201 (1971). Petitioner argues that his case is distinguishable *488 from other cases involving residents and interns in that aside from his work of teaching, holding seminars and giving lectures in pathology to nurses and interns, which he concedes otherwise would have necessitated a staff person of the hospital being used for the function, his services were duplicated by the chairman of the department and, therefore, did not amount to services rendered for the benefit of the hospital. [3] The record shows that during the year here involved the work petitioner did was reviewed by the chairman of the hospital. Also, as petitioner points out, there had only been one staff pathologist at the hospital from the time it commenced operation up to the time of the commencement of petitioner's residency. Petitioner concludes from these facts that he did not contribute services to the hospital which otherwise would have been done by someone else. Petitioner also stresses the fact that he did not have contact with patients and contribute to the hospital in this manner as did many residents *489 and interns. All that petitioner's argument amounts to is that the hospital could have functioned without his work. In fact, the indication from the record is that the hospital could have functioned without the staff pathologist by sending its work out to other hospitals.However, the fact that the hospital could, and in years prior to the time petitioner came, did operate only with the staff pathologist, does not of itself warrant the conclusion that the amount paid to petitioner was noncompensatory. See Fisher v. Commissioner,supra. Certainly the fact that a staff pathologist could operate without the assistance of a resident does not mean that the work of the resident was not helpful to the staff pathologist, and in fact, the indication from this record is that petitioner's work was of assistance to the staff pathologist and to the hospital. Also, petitioner by his contract was bound to perform whatever duties were assigned to him. The very nature of pathology as a specialty is such that patient contact is not to be expected. However, the patients are assisted by the work of the pathologist by the reports furnished to the surgeon and the doctor who do *490 have the patient contact. [4]
Considering all the facts here present, we conclude that the services rendered by petitioner to the hospital are comparable to the services generally rendered by interns and residents. *491 With few exceptions, stipends paid to interns and residents have been held to represent compensation for services rather than fellowship grants. See Rosenthal v. Commissioner,63 T.C. 454, 461 (1975), and cases there cited. On the basis of this record, we conclude that the payments made to petitioner were for services rendered and that he is not entitled to the $3,000 exclusion which he claimed on his tax return as a fellowship grant. Decision will be entered for the respondent. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise stated.↩
2. SEC. 117. SCHOLARSHIPS AND FELLOWSHIP GRANTS. (a) General Rule.--In the case of an individual, gross income does not include-- (1) any amount received-- * * *
(B) as a fellowship grant, including the value of contributed services and accommodations; and * * *
(b) Limitations.-- * * *
(2) Individuals Who Are Not Candidates For Degrees.-- In the case of an individual who is not a candidate for a degree at an educational institution (as defined in section 151(e)(4)), subsection (a) shall apply only if the condition in subparagraph (A) is satisfied and then only within the limitations provided in subparagraph (B). (A) Conditions For Exclusion.--The grantor of the scholarship or fellowship grant is-- (i) an organization described in section 501(c)(3) which is exempt from tax under section 501(a), (ii) a foreign government, (iii) an international organization, or a binational or multinational educational and cultural foundation or commission created or continued pursuant to the Mutual Educational and Cultural Exchange Act of 1961, or (iv) the United States, or an instrumentality or agency thereof, or a State, a territory, or a possession of the United States, or any political subdivision thereof, or the District of Columbia. (B) Extent of Exclusion.--The amount of the scholarship or fellowship grant excluded under subsection (a)(1) in any taxable year shall be limited to an amount equal to $300 times the number of months for which the recipient received amounts under the scholarship or fellowship grant during such taxable year, except that no exclusion shall be allowed under subsection (a) after the recipient has been entitled to exclude under this section for a period of 36 months (whether or not consective) amounts received as a scholarship or fellowship grant while not a candidate for a degree at an educational institution (as defined in section 151(e)(4)↩).
3. In our view petitioner's work of up to 5 hours a week in conducting lectures and seminars was valuable to the hospital and not as "incidental" as petitioner argues.↩
4. Two cases involving pathologists have been decided by this Court. Nugent v. Commissioner,T.C. Memo. 1974-161, and Handelman v. Commissioner,T.C. Memo. 1975-331. Though understandably there are some factual differences in the work assigned to the residents in pathology in those cases and to petitioner, basically petitioner's work as a resident in pathology was the same as the residents involved in those cases. Petitioner attempts to distinguish the Nugent↩ case by the fact that the taxpayer involved in that case performed autopsies and conducted tests in surgical pathology. However, the facts in that case show that the resident's duties were performed under the supervision of a staff pathologist who reviewed and approved all reports and diagnoses made by the resident. Except as to quantity of review by the staff pathologist, there is little distinction in the cases.